Nos. 21-16506 and 21-16695

---

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

---

EPIC GAMES, INC., Plaintiff-counter-defendant-Appellant
v.
APPLE INC., Defendant-counter-claimant-Appellee

and

EPIC GAMES, INC., Plaintiff-counter-defendant-Appellee
v.
APPLE INC., Defendant--counter-claimant-Appellant

---

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:20-cv-05640-YGR
The Honorable Yvonne Gonzalez Rogers

---

## BRIEF OF AMICI CURIAE LAW, ECONOMICS, AND BUSINESS PROFESSORS IN SUPPORT OF APPELLANT/CROSS-APPELLEE EPIC GAMES, INC.

---

Christopher M. Wyant
  *Counsel of Record*
K&L Gates, LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Telephone: (206) 370-7893
Email: chris.wyant@klgates.com

Andrew Mann
  *Counsel of Record*
K&L Gates, LLP
1601 K Street
Washington, D.C. 20006
Telephone: (202) 778-9071
Email: drew.mann@klgates.com

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the following *Amicus Curiae* professors of law, economics and/or business hereby state that they are individuals and do not issue stock or have a parent corporation:

John B. Kirkwood
Professor of Law
Seattle University School of Law

Joseph P. Bauer
Professor of Law Emeritus
University of Notre Dame School of Law

Peter Carstensen
Professor of Law Emeritus
University of Wisconsin School of Law

Rena Conti
Associate Professor
Questrom School of Business
Boston University

Hiba Hafiz
Assistant Professor of Law
Boston College of Law

Thomas J. Horton
Professor of Law
University of South Dakota School of Law

Robert H. Lande
Venable Professor of Law
University of Baltimore School of Law

Viktoria H.S.E. Robertson
Professor and Head of the Competition and Digitalization Group
Vienna University of Economics and Business

i

Kurt M. Sanders
Chair & Professor
Department of Business Law
College of Business and Economics
California State University

Joshua Davis
Professor of Law
University of California, Hastings School of Law

Harry First
Charles L. Denison Professor of Law
New York University School of Law

Warren Grimes
Irving D. and Florence Rosenberg Professor of Law
Southwestern School of Law

Christopher R. Leslie
Chancellor's Professor of Law
University of California, Irvine School of Law

H.H.B. Vedder
Professor of Economic Law
University of Groningen

Dated: January 27, 2022      Respectfully submitted,

*s/ Christopher M. Wyant*
Christopher M. Wyant
  *Counsel for Amicus Curiae*
K&L Gates, LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Telephone: (206) 370-7893
Email: chris.wyant@klgates.com

311667037.1

Andrew Mann
  *Counsel for Amicus Curiae*
K&L Gates, LLP
1601 K Street
Washington, D.C. 20006
Telephone: (202) 778-9071
Email:  drew.mann@klgates.com

iii

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT ........................................................ I

INTEREST OF AMICI CURIAE ................................................................1

I.     INTRODUCTION ................................................................2

II.    SUMMARY OF ARGUMENT ....................................................4

III.   ARGUMENT........................................................................8

      A.    Apple Possesses Monopoly Power........................................8

      B.    Apple's Exclusionary Conduct Satisfies the Agreement
            Element of Section 1. ........................................................20

IV.   CONCLUSION........................................................................23

STATEMENT OF THE PARTIES' CONSENT ....................................................27

311667037.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   9 F.4th 1102 (9th Cir. 2021) ................................................................12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992).................................................................8, 19, 20

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984)........................................................................7, 22

*Newcal, Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ...........................................................19

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.) ....................................8

*Ohio v. American Express Co.*,
   138 S. Ct. 2272 (2018)................................................8, 16, 17, 23

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
   392 U.S. 134 (1968)...........................................................................22

*Simpson v. Union Oil Co. of Cal.*,
   377 U.S. 13 (1964)..............................................................................22

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956).......................................................................9, 10

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)...................................................*passim*

*United States v. Visa U.S.A., Inc.*,
   163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir.
   2003) ...................................................................................................11

**Statutes**

15 U.S.C. § 1 ...........................................................................*passim*

15 U.S.C. § 2 ..........................................................................................2, 3, 8

**Other Authorities**

9th Cir. R. 29 ..................................................................................................1

Fed. R. App. P. 26.1 .......................................................................................i

Fed. R. App. P. 29 ..........................................................................................1

John B. Kirkwood, *Market Power and Antitrust Enforcement*, 98 B.U.
    L. Rev. 1169, 1173 (2018) ..................................................................8, 9

311667037.1

Pursuant to Federal Rule of Appellate Procedure 29 and Ninth Circuit Local Rule 29, the following law, economics and business professors collectively submit this brief *amicus curiae* in support of Appellant/Cross-Appellee Epic Games, Inc.'s appeal of the District Court's Findings of Fact, Conclusions of Law and Judgment: John B. Kirkwood (Seattle University School of Law); Joseph P. Bauer (University of Notre Dame School of Law); Peter Carstensen (University of Wisconsin School of Law); Rena Conti (Boston University, Questrom School of Business); Hiba Hafiz (Boston College of Law); Thomas J. Horton (University of South Dakota School of Law); Robert H. Lande (University of Baltimore School of Law);Viktoria H.S.E. Robertson (Vienna University of Economics and Business;) Kurt M. Sanders (California State University College of Business and Economics); Joshua Davis (University of California, Hastings School of Law); Harry First (New York University School of Law); Warren Grimes (Southwestern School of Law); Christopher R. Leslie (University of California, Irvine School of Law); H.H.B. Vedder (University of Groningen). All parties have consented to this filing.

## INTEREST OF AMICI CURIAE

The undersigned amici curiae are professors of antitrust law, economics, and business who have an interest in seeing that the antitrust laws are properly interpreted

and enforced.[1] We submit this brief because the District Court erroneously concluded that defendant had not violated Section 1 and Section 2 of the Sherman Act. 15 U.S.C. §§ 1 & 2. In particular, the Court mistakenly concluded that Apple, Inc. ("Apple") did not possess monopoly power and that its agreements with app developers were exempt from Section 1. These rulings are inconsistent with antitrust law and policy and, if allowed to stand, will undermine antitrust enforcement.

## I.   **INTRODUCTION**

Epic Games, Inc. ("Epic") alleges that Apple violated Section 2 and Section 1 of the Sherman Act. Section 2 prohibits monopolization – the acquisition or maintenance of monopoly power through anticompetitive conduct.  As we explain below, monopoly power is the power to charge a price that substantially exceeds the competitive price. Anticompetitive conduct (in a Section 2 case) is conduct that creates or preserves monopoly power without generating procompetitive benefits for customers that outweigh the harms of monopoly power.

Epic contends that Apple exercises monopoly power over the distribution of apps for iOS devices (iPhones and iPads). As a result, Apple charges a commission

---

[1] No party's counsel has authored the brief in whole or in part; no party's counsel has contributed money intended to fund preparing or submitting the brief; and no person other than the amici curiae, its members, or its counsel have contributed money that was intended to fund preparing or submitting the brief.

2

rate on app transactions that is *four times* the costs of the App Store, striking evidence of monopoly power. Epic alleges that Apple protects this power through two forms of exclusionary conduct: it requires app developers to distribute their iOS apps only through the App Store and it bars them from using their apps to direct users toward cheaper alternatives. Epic asserts that these restrictions – an exclusive distribution requirement and a steering ban – harm competition and both sets of Apple's customers (app developers and app users).[2]

Like Section 2, Section 1 of the Sherman Act prohibits behavior that injures customers by reducing competition. Unlike Section 2, however, Section 1 does not require monopoly power; Section 1 demands an agreement in restraint of trade. An agreement in restraint of trade is a mutual commitment by independent firms to anticompetitive conduct. Epic alleges that Apple obtained such commitments from iOS app developers by insisting that they agree in writing to Apple's restrictions.

The District Court's Conclusions of Law[3] regarding monopoly power and agreement are erroneous as a matter of law. The District Court concluded that Apple did not have monopoly power because Epic had not shown that Apple had restricted output and because Epic's definition of the relevant market was too narrow. The

---

[2] In addition to the steering ban, Apple requires developers to use its payment system for all in-app sales of digital content.

[3] Unless otherwise stated, all citations are to the District Court's Rule 52 Order After Trial on the Merits, 2-ER-3 through 2-ER-187. *See* Appellate Dkt. No. 42-2.

District Court stated that Apple's written agreements with app developers were not covered by Section 1 because Apple required the developers to sign them. These conclusions are contrary to the evidence and the goals of the Sherman Act. The District Court's own Findings of Fact show that there was compelling direct and indirect evidence of Apple's monopoly power. In consequence, there was no need to require Epic to show restricted output. Likewise, the District Court should not have rejected Epic's market definition in favor of a broader definition that assumed that competing devices would constrain Apple's pricing power. The evidence shows they do not. Finally, the District Court's ruling on the existence of a Section 1 "agreement" is inconsistent with Supreme Court precedent and antitrust policy. It would allow firms with market power to escape Section 1 scrutiny simply by requiring third parties to agree to their restraints.

## II.  <u>SUMMARY OF ARGUMENT</u>

*Monopoly Power.* Apple exercises monopoly power in the distribution of iOS apps. Apple possesses such power because over a billion consumers own iPhones or iPads, and these consumers rarely use or switch to other devices. As a result, app developers can reach this enormous consumer base only by accessing an iPhone or iPad, and Apple controls that access. It insists that app developers sign agreements that (1) prohibit developers from accessing iPhone or iPad users except through Apple's App Store and (2) prevent developers from informing users through their

4

apps of cheaper payment alternatives. Apple also requires developers to pay Apple's commission charges on any transactions with users. Together, these restrictions enable Apple to exact a very high price for access to iOS device users. Apple's commission charges on app distribution and app transactions are so high relative to the costs of the App Store that Apple's profit margin on App Store transactions is 75%. That means that out of every four dollars of commission revenue Apple receives, just one dollar is needed to cover Apple's costs; the other three dollars are pure profit. It also means that Apple's average commission charge is *four times* its average total cost, striking evidence that Apple is pricing substantially above the competitive level, the definition of monopoly power.[4]

The size and durability of Apple's profit margin – it has existed for nearly a decade[5] – is direct evidence of monopoly power. Apple's restrictions (its insistence on exclusive distribution and its ban on steering) provide further direct evidence of monopoly power for, without them, competition would have caused Apple's commission charges to fall substantially. Because of these restraints, Apple can price substantially above the level that would have prevailed in a free competitive market.[6]

---

[4] *See infra* Section III.A.

[5] 2-ER-45 (Apple's profit margin "has exceeded 72%" since at least 2013).

[6] Google's usual commission charge is also 30%, but that does not show that 30% is the competitive level. Both Apple and Google have recently lowered their rates to 15% for developers earning less than one million dollars annually. Op. 74. And

5

The District Court agreed that Apple earned extraordinarily high profits but did not find monopoly power because Epic had not shown that Apple's conduct had restricted output. As the District Court acknowledged, however, Epic showed that Apple's restraints reduced output in two ways: they lowered product quality and diminished innovation. Moreover, there was no need to show a reduction in total industry sales because there was compelling direct evidence of monopoly power. That evidence establishes monopoly power by itself. Finally, it is not possible to show that Apple's conduct restricted industry sales because other factors, such as soaring demand for gaming, were simultaneously causing sales to increase. Where proof of restricted output is unnecessary and impossible, it should not be required.

The District Court also declined to find monopoly power because it found that Apple's market share fluctuated between "approximately 52% and 57%" (2-ER-140), which along with other evidence put Apple "near the precipice" of monopoly power (2-ER-142) but not over it. Apple's market share, however, depends on the definition of the relevant market and the District Court's definition – all digital mobile gaming transactions – is overbroad. It implies that consumers readily switch between gaming transactions on Android phones and gaming transactions on Apple's devices, and they do not. Consumers who prefer iPhones or iPads do not

_____

Microsoft and Epic now charge standard commission rates of 12%. Op. 75. Epic has also brought an antitrust action against Google.

switch to other devices because Apple's commission charge is so high. If they did, Apple could not maintain its high commission rate and its extraordinary profit margin.

Moreover, Apple could not maintain its high commission rate if third-party apps and app stores could distribute directly to iOS device users. To forestall this competition, Apple insists on exclusive distribution and prohibits steering. Absent these restraints, it is likely that commission rates would fall substantially. This fact constitutes additional direct evidence of monopoly power because it means that Apple is pricing substantially above the level that would prevail if competition were unrestricted.

*Agreement.* The District Court ruled that Apple's conduct did not satisfy the agreement element of Section 1 because Apple *required* app developers to agree to its restraints. The District Court relied on the proposition that "a business may set conditions for dealing unilaterally and refuse to deal with anyone who does not meet those conditions," 2-ER-145, citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984). But *Monsanto* made clear that this proposition does not apply when a business seeks and obtain agreements to abide by its conditions. *See id.* at 764 n.9. Similarly, a business does not escape Section 1 scrutiny because it demands that customers sign those agreements. The Supreme Court held that American Express' anti-steering provisions were vertical agreements covered by Section 1

7

even though American Express *required* merchants to *agree* to them. *See Ohio v. American Express Co.*, 138 S. Ct. 2272, 2280 and 2284 (2018). In short, a coerced agreement is still a contract covered by Section 1, as the District Court actually acknowledged at one point. 2-ER-145 (when a business is found "coercing an agreement, the conduct falls under Section 1.").

## III.   ARGUMENT

### A.   Apple Possesses Monopoly Power.

Monopoly power is the ability to "profitably raise prices substantially above the competitive level." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1070 (10th Cir. 2013) (Gorsuch, J.) ("To prevail on a section 2 claim, a plaintiff generally must show the defendant possessed sufficient market power to raise prices substantially above a competitive level without losing so much business that the gambit becomes unprofitable."); 2-ER-142 (equating "monopoly power" with "substantial market power"); John B. Kirkwood, *Market Power and Antitrust Enforcement*, 98 B.U. L. Rev. 1169, 1173 (2018) ("monopoly power demands a substantial amount of market power"); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires . . . something greater than market

power under § 1.").[7] Both direct and indirect evidence show that Apple exercises monopoly power in the market for the distribution of iOS apps.

*Direct Evidence*. Apple's profit margin on App Store commissions is direct evidence of monopoly power. A profit margin of 75% means that Apple's commission revenue is *four times* its total costs, a powerful indication that it is pricing substantially above the competitive level.[8] The District Court agreed that Apple's profit margins on its App Store are "extraordinarily high," 2-ER-46 & 2-ER-97, that they "strongly show market power," 2-ER-97, and that they have persisted since at least 2013. 2-ER-95. The District Court declared that Apple's operating margins are "excessive . . . under any normative measure," 2-ER-166, and

---

[7] Sixty years ago, the Supreme Court declared that "Monopoly power is the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391 (1956). Today, most courts and antitrust scholars use the more rigorous definition of monopoly power set forth in *Microsoft. See* Kirkwood, 98 B.U. L. Rev. at 1173 n. 14.

[8] This profit margin is a total margin, not a contribution margin. It is based on all of Apple's costs, not just its variable costs. In calculating this margin, Epic expert Ned Barnes explained that he considered Apple's fixed as well as its variable costs, including "selling, general and administrative expenses, and research and development ("R&D") expenses." 2-ER-44. Apple's own calculation of its "fully burdened" operating margin is largely consistent. 2-ER-45 ("Apple has calculated a fully burdened operating margin for the App Store as part of their normal business operations. Apple's financial planning and analysis team are tracking revenues, fixed and variable operating costs, and allocation of IT, Research & Development, and corporate overheads to an App Store P&L statement. The team's calculation was largely consistent with that of Mr. Barnes.").

9

that its "commission rate . . . has not been justified." *Id.* The App Store is "incredibly profitable" and "there appears to be no market forces to . . . motivate a change." 2-ER-101.

The magnitude of Apple's profit margin and its imperviousness to competition are compelling evidence that Apple is exercising monopoly power. They show that Apple has both the power to control price and the power to exclude competition. *DuPont*, 351 U.S. at 391. Apple expert Dr. Schmalensee objected that the 75% margin is based on accounting costs, not economic costs, and thus would exclude *past* investments in intellectual property. The District Court correctly rejected this critique, however, because of "Apple's low apparent investment in App Store-specific intellectual property." 2-ER-96. Indeed, "Apple has actually never correlated the value of its intellectual property to the commission it charges." 2-ER-97. This reflects a deeper problem: Apple never established that it was pricing at the competitive level. Like Microsoft, Apple never identified its long-run economic costs and showed that its commission rate did not exceed them. *See Microsoft*, 253 F.3d at 57. Accordingly, the District Court found that "the commission rate driving the excessive margins has not been justified." 2-ER-166.

Apple's exclusionary conduct provides further direct evidence of monopoly power. Absent Apple's restrictions on distribution and steering, commission rates would have fallen sharply. The District Court found that these restraints kept prices

10

higher than they would have been otherwise: "Apple's restrictions on iOS game distribution have *increased prices* for developers. In light of Apple's high profit margins on the App Store, a third-party store could likely provide game distribution at a *lower commission*." 2-ER-102 (emphasis added). The District Court was unwilling to estimate how far commission rates would have fallen had Apple allowed unrestricted competition in iOS app distribution. *See* 2-ER-100-101. But the evidence strongly suggests that the reduction would have been substantial. That is because Apple's total costs are only 25% of its commission revenues.

The District Court refused to accept any of this direct evidence of monopoly power because Epic had not shown that Apple's conduct had restricted output. 2-ER-140-141. The District Court reasoned that supracompetitive pricing does not establish monopoly power without evidence of restricted output. 2-ER-140. In fact, however, there was evidence of reduced output. The District Court found that Apple's conduct dampened innovation[9] and lowered quality,[10] both of which restrict output, as courts have recognized. *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001) (reduced innovation), *aff'd*, 344 F.3d 229 (2d

---

[9] 2-ER-105 ("Apple's restrictions reduce innovation in 'core' game distribution services.").

[10] 2-ER-148 n. 606 (finding that Apple limits services to both app developers and users, "which reduces quality").

Cir. 2003); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021) (reduced quality). More importantly, there is no need to establish restricted output when a plaintiff offers compelling evidence of supracompetitive pricing. That evidence establishes market power or monopoly power by itself. Here, the District Court found that Apple's commission rate "strongly shows market power," 2-ER-97, is excessive by any measure, 2-ER-166, and is not cost justified. *Id.* As a result, Apple's price appears to be "artificially higher . . . than it would be in a more competitive market." 2-ER-140. Given this evidence of supracompetitive pricing, proof of restricted output was superfluous.[11]

There is also a severe practical problem in demonstrating that Apple's conduct restricted output. As the District Court acknowledged, that would require separating out the effects of Apple's restraints from other influences on output, and in this case those other influences were powerful. The District Court found that the "growth in iOS game transactions" occurred at the same time as "both strong growth in the gaming industry and strong growth in iPhone and iPad sales." 2-ER-102 n. 488.[12]

---

[11] Since supracompetitive pricing is often accompanied by lower output, a court might require proof of restricted output where the other evidence of supracompetitive pricing is unclear and the impact of the defendant's conduct on output can be determined. Neither condition is satisfied in this case.

[12] The District Court noted that "[t]hese factors could cause mobile game transactions to grow even if Apple's restrictions are anticompetitive." 2-ER-102 n. 488.

311667037.1

Because of these confounding factors, it is not possible to demonstrate the independent effect of Apple's exclusionary conduct on output. Notably, Apple did not do so. It did not show that in the absence of its restraints, industry output would have been lower. In this case, therefore, proof of restricted output was both unnecessary and impossible, and should not have been required by the District Court.

*Indirect Evidence*. Epic's indirect evidence of monopoly power reinforces the direct evidence. Epic defined the relevant market as the distribution of iOS apps. This definition reflects the commercial realities of the industry. Virtually all consumers "single home" (meaning they use an iPhone or an Android phone but not both),[13] and they rarely switch between the two types of phones.[14] Consequently, app developers need to be on both platforms. They cannot reach the more than a billion consumers who use iOS devices by distributing their apps on Android phones.[15] This fact enables Apple to exercise monopoly power. By controlling the distribution of iOS apps – by excluding other distributors and suppressing information about cheaper payment methods – Apple can extract a high price for

---

[13] 2-ER-55 ("in the smartphone context, consumers typically 'single home.'").

[14] *Id.* ("The evidence shows that very few consumers own both Android and iOS devices, and that currently, very low switching rates exist, with only about 2% of iPhone users switching to Android each year.")

[15] *Id.* ("developers compete for single-homing users . . . and cannot afford to forego particular platforms without losing those other customers.").

13

access to its enormous customer base. App developers must pay that price to transact with users of iOS devices.

A broader market definition would be appropriate only if consumers readily switched between iOS devices and other platforms. But several factors impede seamless switching. First, consumers face significant switching costs in moving from an iPhone to an Android phone. The District Court agreed that consumers confront several different types of switching costs.[16] It did not find, however, that these costs were substantial because Dr. Athey's testimony on the subject included little empirical evidence. *See* 2-ER-53. Yet the widespread absence of switching is itself evidence that switching is costly. Moreover, the absence of switching is accentuated by a second factor: many consumers prefer iPhones to Android phones. The District Court found that consumers who choose an iPhone typically do so because they prefer its speed, reliability, construction quality, or battery life. 2-ER-54. These preferences curtail switching because consumers would lose the features they value if they exchanged an iPhone for an Android phone. Third, consumers lack a powerful incentive to switch because they are generally unaware of Apple's high

---

[16] 2-ER-53 (finding that "it takes time to find and reinstall apps or find substitute apps; to learn a new operating system; and to reconfigure app settings. It is further apparent that one may need to repurchase phone accessories."). Consumers must incur these switching costs because the iPhone and the iPad are expensive durable goods linked to an elaborate ecosystem of products and services. Switching involves purchasing an expensive new device and creating a new ecosystem.

14

commission charges. Apple imposes these charges on app developers, not consumers.

The widespread absence of switching is confirmed by the fact that Apple set – and still sets – its commission rate without regard to its costs or its competitors' prices. Apple could not ignore these variables if consumers commonly switched among devices, for the resulting price competition would constrain Apple's prices and force them closer to its costs. Yet when Apple initially chose its commission rate, it recognized that there were "no true comparisons in the market" and its rate could be set "without considering costs." 2-ER-100 n. 483; 2-ER-38. Today, "Apple still does not track . . . pricing on different platforms to determine its rate." 2-ER-95 n. 459. This indifference to competitors' prices is a hallmark of monopoly power. The D.C. Circuit cited it in holding that Microsoft had monopoly power. *See Microsoft*, 352 F.3d at 58.

Despite the direct and indirect evidence of monopoly power, the District Court ruled that the relevant market was "***digital mobile gaming transactions***." 2-ER-4 (emphasis in original). This market definition is fundamentally flawed because it includes gaming platforms like the Android phone that do not constrain Apple's power over iOS app distribution. Before addressing that flaw, however, it is useful to comment on two other aspects of the District Court's market definition. First, the District Court restricted the market to *gaming* transactions, rather than *all* app

transactions, because "most App Store revenue is generated by mobile gaming apps." *Id.* But using revenue, rather than substitutability, to define a market has no basis in precedent or antitrust policy. After all, the App Store contains thousands of non-gaming apps. Since Apple restricts the distribution of those apps, they should be included in the relevant market as well.

Second, the District Court defined the market in terms of *transactions*, rather than app *distribution*, because the App Store is a two-sided transaction platform (with users on one side and app developers on the other). The Supreme Court has in fact held that the relevant market in the case of a two-sided transaction platform is a two-sided transaction market. *See American Express*, 138 S. Ct. at 2286.[17] As the District Court recognized, however, there is no substantive difference between app distribution services and app transactions. 2-ER-124. Because Apple monopolizes iOS app distribution services, it also monopolizes iOS app transactions. An app developer cannot engage in a transaction with an iPhone user without agreeing to Apple's distribution restrictions. Thus, it does not ultimately matter whether the relevant market is a transaction market or a distribution market. A distribution

---

[17] The Supreme Court noted that the "key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." 138 S. Ct. at 2280. Epic agrees that the App Store is a two-sided transaction platform. 2-ER-124.

market appears more accurate, however, because Apple's power rests in large part on its control of app distribution.

The crucial issue is whether this market should be limited to iOS apps or should include all mobile apps. The District Court chose the broader market because it found that "neither consumers nor developers are 'locked-in' to the App Store for digital mobile game transactions." 2-ER-135. Instead, "the App Store competes against other platforms for both consumers and developers." *Id.* These findings are erroneous as a matter of law. If they were true, Apple could not earn an extraordinarily high profit margin on iOS app transactions or charge commission rates that are excessive and unjustified. Competition would obliterate its pricing power.

One source of Apple's monopoly power is product differentiation. As stated earlier, millions of consumers prefer iOS devices to other devices because of their superior features and performance. This source of monopoly power is not illegal, but it leads to substantial pricing power. A legitimately obtained monopoly is still a monopoly. A second source is Apple's exclusionary conduct, which allows it to control iOS app distribution and prevents competition from undermining its commission charges. As noted, the District Court found that Apple's restraints block

311667037.1

third-party apps and app stores from offering lower commissions on iOS app transactions.[18]

Despite these sources of power, the District Court concluded that competition at the device level – in what Epic called the fore-market – would prevent Apple from charging a monopoly price in the aftermarket. In fact, that has not happened. Competition at the device level – between iPhones and Android phones and between iPads and Microsoft tablets – has not precluded Apple from earning extraordinary profits in the aftermarket. There is no evidence that significant numbers of consumers have or would switch platforms in order to obtain a lower commission rate on app transactions. Instead, as the District Court pointed out in describing an Apple survey, "Consumers who switched from Android to iOS did so for hardware reasons, such [as] 'speed,' 'quality device construction,' and 'battery' – *not app quality, price, or availability*." Op. 2-ER-54 n. 269 (emphasis added). The District Court stated: "This reinforces Dr. Evans' point that apps are a secondary consideration when purchasing a smartphone and would not lead to switching by themselves." *Id.*

---

[18] *See, e.g.,* 2-ER-147 (Apple's "restrictions harm competition by precluding developers, especially larger ones, from opening competing game stores on iOS and compet[ing] for other developers and users on price."); *id.* at 167 (Apple's anti-steering provisions "prevent[] substitution among platforms for transactions").

311667037.1

Accordingly, the evidence satisfies the critical precondition for aftermarket harm articulated in *Newcal, Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1050 (9th Cir. 2008); namely, that "[c]ompetition in the initial market . . . does not . . . suffice to discipline anticompetitive practices in the aftermarket." That is why the Supreme Court rejected summary judgment for the defendant in *Kodak,* 504 U.S. at 451. The Supreme Court ruled that high information and switching costs in the initial market for photocopiers prevented buyers from disciplining Kodak's conduct in the aftermarkets for parts and service. *See id.* at 472-79. The District Court refused to follow *Kodak*, however, citing cases that had restricted the decision to situations in which the defendant adopted an aftermarket restraint *after* customers had purchased its product in the initial market. 2-ER-130-135. These cases reason that if customers *know* of the restraint before they purchase, they can switch or threaten to switch their purchases, which would force the defendant to behave competitively in the aftermarket.

But customer knowledge of an aftermarket restraint is not always sufficient to preclude monopoly power in the aftermarket. While many consumers are aware that Apple is the only source of iOS apps, they do not switch to competing devices in sufficient numbers to drive down Apple's extraordinary App Store profit margin. The evidence is extensive, as shown above. Consumers do not pay Apple's commission charges and do not generally know how high they are. Developers

19

cannot bring the issue to their attention by informing them of cheaper alternatives.[19]
Consumers face substantial switching costs, and switching rates are very low. Most
importantly, Apple's excessive profit margin on App Store transactions has persisted
for nearly a decade. If competition in the device market were sufficient to preclude
Apple from exercising monopoly power in the app distribution market, that would
not occur. The District Court pointed to no case refusing to apply *Kodak* that
involved comparable direct evidence of monopoly power.

Thus, the relevant product market is the distribution of iOS apps, not the
distribution of all apps,[20] and Apple is the sole seller in that market. The relevant
geographic market is global (except for China). 2-ER-136. Entry barriers are high
because Apple's exclusionary conduct blocks entry into the relevant market. In
short, both direct and indirect evidence demonstrate that Apple exercises monopoly
power.

### B. Apple's Exclusionary Conduct Satisfies the Agreement Element of Section 1.

Apple also violated Section 1 of the Sherman Act because its exclusionary
conduct was enforced through written agreements between Apple and app

---

[19] *See* 2-ER-5 ("Apple's anti-steering provisions hide critical information from
consumers and illegally stifle consumer choice.")

[20] Alternatively, the relevant product market is iOS app transactions, not all app
transactions or all digital mobile gaming transactions.

developers. These agreements constitute "contract[s] . . . in restraint of trade." 15 U.S.C. § 1.

The District Court found that Apple's restrictive practices were embodied in two agreements between Apple and app developers. The first is an agreement that all developers using the App Store must sign called the Developer Product Licensing Agreement (DPLA). 2-ER-21. Sections 3.2 and 3.3 of the agreement contain Apple's exclusive distribution restraints. 2-ER-33. All developers also agree to "abide by the App Guidelines." 2-ER-34 n. 192. Section 3.1.1 of the App Guidelines sets forth the anti-steering provision. 2-ER--34. The District Court called these agreements "Apple's Contractual Agreements with Developers," 2-ER- 231, and stated that by entering into these agreements, Epic had made "contractual commitments" to Apple. 2-ER-29.

The District Court recognized that these "express agreements provide 'direct evidence' of concerted activity." 2-ER-144. Yet the Court did not conclude that these "contractual agreements" satisfied the "contract" element of Section 1. Instead, the District Court believed there was an unstated exception in Section 1 for coerced agreements – what the District Court called "unilateral contracts." The District Court stated that because "a developer must accept [the DPLA's] provisions (including the challenged restrictions) to distribute games on iOS," "the DPLA is a unilateral contract." 2-ER-145.

21

The District Court invoked the term "unilateral" because of vertical restraints case law, which allows a business to "set conditions for dealing unilaterally and refuse to deal with anyone who does not meet those conditions," 2-ER-142 (citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984)). But setting conditions unilaterally and refusing to deal with third parties who do not satisfy those conditions is not the same as insisting that third parties *agree* to those conditions. *Monsanto* stated that when a supplier goes beyond announcing its conditions and seeks a distributor's agreement to those conditions – and the distributor acquiesces – Section 1 applies. *See id.* at 764 n. 9. Thus, when Apple insisted that app developers execute the DPLA and agree to abide by the App Guidelines, and they did, app developers entered into contracts with Apple that were covered by Section 1.

The fact that Apple demanded these agreements does not create an exception, as the District Court acknowledged at one point, stating that when a business engages in "coercing an agreement, the conduct falls under Section 1." Op. 2-ER-145. The Supreme Court has repeatedly declared that express agreements are covered by Section 1 even when one party imposes them on another. *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 143 (1968) (holding that each plaintiff-franchisee may "clearly charge a combination between [the defendant-franchisor] and himself, as of the day he unwillingly complied with the restrictive franchise agreements"); *Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 14, 17 (1964) (finding

"an agreement", even though defendant allegedly "required its retail outlets to sign" it). The Supreme Court reaffirmed this principle in *American Express*, stating that American Express' anti-steering provisions were vertical agreements covered by Section 1, *American Express*, 138 S. Ct. at 2284, even though merchants that carried Amex cards were *required* by Amex to *agree* to those provisions. *Id.* at 2280.

Antitrust policy could not be otherwise. If coerced agreements were exempt from Section 1, a firm with market power could restrain trade without fear of Section 1 liability simply by forcing suppliers or customers to agree to the restraints. That would frustrate the purpose of Section 1.

## IV.   **CONCLUSION**

The District Court's Findings of Fact and Conclusions of Law on monopoly power and the existence of a Section 1 agreement should be reversed for the reasons set forth above.

Respectfully submitted, this 27th day of January, 2022.

   *s/ Christopher M. Wyant*
Christopher M. Wyant
   *Counsel for Amicus Curiae*
K&L Gates, LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
Telephone: (206) 370-7893
Email: chris.wyant@klgates.com

23

311667037.1

Andrew Mann (*admission pending*)
  *Counsel of Record*
K&L Gates, LLP
1601 K Street
Washington, D.C. 20006
Telephone: (202) 778-9071
Email:  drew.mann@klgates.com

*Amicus Curiae*

John B. Kirkwood
Professor of Law
Seattle University School of Law

Joseph P. Bauer
Professor of Law Emeritus
University of Notre Dame School of Law

Peter Carstensen
Professor of Law Emeritus
University of Wisconsin School of Law

Rena Conti
Associate Professor
Questrom School of Business
Boston University

Hiba Hafiz
Assistant Professor of Law
Boston College of Law

Thomas J. Horton
Professor of Law
University of South Dakota School of Law

Robert H. Lande
Venable Professor of Law
University of Baltimore School of Law

311667037.1

Viktoria H.S.E. Robertson
Professor and Head of the Competition and Digitalization Group
Vienna University of Economics and Business

Kurt M. Sanders
Chair & Professor
Department of Business Law
College of Business and Economics
California State University

Joshua Davis
Professor of Law
University of California, Hastings School of Law

Harry First
Charles L. Denison Professor of Law
New York University School of Law

Warren Grimes
Irving D. and Florence Rosenberg Professor of Law
Southwestern School of Law

Christopher R. Leslie
Chancellor's Professor of Law
University of California, Irvine School of Law

H.H.B. Vedder
Professor of Economic Law
University of Groningen

25

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s): 21-16506 and 21-16695**

I am the attorney for *Amicus Curiae*.

**This brief contains <u>5,345</u> words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (*select only one*):

[] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (*select only one*):
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs; or
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature:**  *s/ Christopher M. Wyant*          **Date:**  January 27, 2022

26

## STATEMENT OF THE PARTIES' CONSENT

In accordance with Federal Rule of Appellate Procedure 29(a), counsel reports that counsel to Appellants and counsel for Appellees have each given consent to the filing of this amicus brief.

**Signature:**  *s/ Christopher M. Wyant*     **Date:**  January 27, 2022

27

311667037.1

CERTIFICATE OF SERVICE

I certify that on January 27, 2022, I arranged for electronic filing of the foregoing document with the Clerk of the Court using the appellate CM/ECF system, which will send notification of such filing to all parties of record.

s/ Christopher M. Wyant
Christopher M. Wyant
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA  98104
Phone:  (206) 623-7580
Fax:  (206) 623-7022
E-mail:  chris.wyant@klgates.com

28

311667037.1