**Docket Nos. 21-16506, 21-16695**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

---

EPIC GAMES, INC.,

*Plaintiff/Counter-Defendant, Appellant/Cross-Appellee,*

v.

APPLE, INC.,

*Defendant/Counter-Claimant, Appellee/Cross-Appellant.*

---

*Appeal from a Decision of the United States District Court for the Northern District of California,*
*No. 4:20-cv-05640-YGR · Honorable Yvonne Gonzalez Rogers*

---

## BRIEF OF *AMICI CURIAE* INTERNATIONAL CENTER FOR LAW & ECONOMICS AND SCHOLARS OF LAW AND ECONOMICS IN SUPPORT OF APPELLEE/CROSS-APPELLANT

JACK E. PACE III
GINA M. CHIAPPETTA
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8520 Telephone
jpace@whitecase.com
gina.chiappetta@whitecase.com

GEORGE L. PAUL
NICHOLAS J. MCGUIRE
WHITE & CASE LLP
701 Thirteenth Street, N.W.
Washington, District of Columbia 20005-3807
(202) 626-3600 Telephone
gpaul@whitecase.com
nicholas.mcguire@whitecase.com

*Attorneys for Amici Curiae International Center for Law*
*& Economics and Scholars of Law and Economics*



# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus International Center for Law & Economics states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: March 31, 2022

*/s/ Jack E. Pace III*
Jack E. Pace III
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
jpace@whitecase.com

*Counsel for* Amici Curiae *International Center for Law & Economics and Scholars of Law and Economics*

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES .......................................................... ii

INTEREST OF AMICI CURIAE....................................................1

INTRODUCTION .........................................................................2

I. The Framework for Assessing Competitive Effects in Two-Sided
Markets Requires a Broad Examination of the Market as a Whole ...............4

    A.     Epic Presents Evidence of Supracompetitive Prices on Only
One Side of a Two-Sided Transaction Market....................................6

    B.     The Lack of Any Demonstrable Reduction in Output
Undermines Epic's Allegations of Harm ................................9

    C.     Epic's Contentions that Apple's Conduct Decreased Innovation
Are Also One-Sided ................................................11

II. The "Less Restrictive Alternatives" Approach Relied Upon by Epic
and Epic *Amici* Is Inconsistent with the Rule of Reason..............................12

    A.     The Less Restrictive Alternatives Test Is Particularly
Inappropriate in the Context of Two-Sided Platform Markets ..........14

    B.     Epic's Proposed Approach to IAP Amounts to Inappropriate
Regulation of Unilateral Pricing Decisions........................................17

    C.     "Open" Platforms Are Not Inherently More or Less Restrictive
than "Closed" Platforms ....................................................19

        1.     Apple's "Open" System Advances the Primary Purpose
of Antitrust Law: Interbrand Competition ..............................19

        2.     Epic's Proposed LRA Ignores Intra-Group Trade-Offs
Among Developers and Among Consumers ..........................26

CONCLUSION................................................................28

i

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

## FEDERAL CASES

*Ball Memorial Hosp. v. Mutual Hosp. Ins*,
   784 F.2d 1325 (7th Cir. 1986) ............................................................10

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988) (Stevens, J., dissenting)....................................20

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
   433 U.S. 36 (1977)........................................................................20, 23

*Epic Games, Inc. v. Apple Inc.*,
   No. 4:20-cv-05640 (N.D. Cal. Sept. 10, 2021), ECF No. 812 ...................*passim*

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...............................................................23

*Heisen v. Pac. Coast Bldg. Prods.*,
   1994 U.S. App. LEXIS 14332 (9th Cir. June 9, 1994)...........................7

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)..............................................................................25

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
   435 U.S. 679 (1978)........................................................................23, 24

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021)................................................................3, 14, 16

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018)..................................................................*passim*

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
   555 U.S. 438 (2009)..............................................................................13

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .................................................................9

*Smith v. Pro Football*,
593 F.2d 1173 (D.D.C. 1978) ...........................................................................14

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)...............................................................................13, 19

## OTHER AUTHORITIES

Alan Devlin, *Antitrust as Regulation*, 49 SAN DIEGO L. REV. 823 (2011)..............13

Alan J. Meese, *Competition and Market Failure in the Antitrust Jurisprudence
of Justice Stevens*, 74 FORDHAM L. REV. 1775 (2006) .......................................24

Andrei Hagiu, *Proprietary vs. Open Two-Sided Platforms and Social Efficiency*
at 19 (AEI-Brookings Joint Ctr. for Regul. Stud., Working Paper No. 06-12,
2006) ..................................................................................................................8, 21

Benjamin Klein et al., *Competition in Two-Sided Markets: The Antitrust
Economics of Payment Card Interchange Fees*, 73 ANTITRUST L.J. 571
(2006) ..................................................................................................................8

David S. Evans & Richard Schmalensee, *The Antitrust Analysis of Multi-Sided
Platform Businesses*, OXFORD HANDBOOK ON INTERNATIONAL ANTITRUST
ECONOMICS 405 (Roger Blair & Daniel Sokol eds., 2013) ................................6

Geoffrey A. Manne, *In Defence of the Supreme Court's "Single Market"
Definition in* Ohio v American Express, 7 J. OF ANTITRUST ENF'T 104
(2019)................................................................................................................4 ,6

Geoffrey A. Manne & Kristian Stout, *The Evolution of Antitrust Doctrine
After* Ohio v. Amex *and the* Apple v. Pepper *Decision That Should Have
Been*, 98 NEB. L. REV. 425 (2019).................................................................6, 10

Herbert Hovenkamp, *Antitrust Balancing*, 12 N.Y.U. J.L. & BUS. 369 (2016) ......14

Jonathan M. Barnett, *The Host's Dilemma: Strategic Forfeiture in Platform
Markets for Informational Goods*, 124 HARV. L. REV. 1861 (2011).................21

Mark Armstrong, *Interactions Between Competition and Consumer Policy*, 4
COMPETITION POL'Y INT'L 97 (Spring 2008)....................................................26

Michael Katz & Jonathan Sallet, *Multisided Platforms and Antitrust Enforcement*,
127 YALE L.J. 2142 (2018) ....................................................................................5

Michael L. Katz & Carl Shapiro, *Systems Competition and Network Effects* 8 J. Econ. Persps. 93 (1994) ......................................................................................22

PHILIP E. AREEDA, ET AL., ANTITRUST LAW, AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 501 (4th ed. 2017)............................9, 14

Thomas A. Lambert, *A Decision-Theoretic Rule of Reason for Minimum Resale Price Maintenance*, 55 ANTITRUST BULL. 167 (2010) .......................................10

Thomas B. Nachbar, *Less Restrictive Alternatives and the Ancillary Restraints Doctrine*, 45 SEATTLE U. L. REV. (forthcoming 2022).......................................15

## INTEREST OF AMICI CURIAE[1]

The International Center for Law & Economics ("ICLE") is a nonprofit, non-partisan global research and policy center aimed at building the intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law & economics methodologies to inform public policy debates and has longstanding expertise in the evaluation of antitrust law and policy.

*Amici* also include 26 scholars of antitrust, law, and economics at leading universities and research institutions around the world. Their names, titles, and academic affiliations are listed in Addendum A. All have longstanding expertise in, and copious research on, antitrust law and economics.

*Amici* have an interest in ensuring that antitrust promotes the public interest by remaining grounded in sensible legal rules informed by sound economic analysis. *Amici* believe that Epic's arguments deviate from that standard and promote the private interests of slighted competitors at the expense of the public welfare.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *Amici* represent that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than the *amici*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief. *Amici* file this brief pursuant to Fed. R. App. P. 29(a)(2) with consent of all parties.

**INTRODUCTION**

Epic challenges Apple's prohibition of third-party app stores and in-app payments ("IAP") systems from operating on its proprietary, iOS platform as a violation of the antitrust laws. But, as the district court concluded, Epic's real concern is its own business interests in the face of Apple's business model—in particular, the commission charged for the use of Apple's IAP system. *See* Order at 1-ER22, *Epic Games, Inc. v. Apple Inc*., No. 4:20-CV-05640 (N.D. Cal. Sept. 10, 2021), ECF No. 812 (1-ER3–183). In essence, Epic is trying to recast its objection to Apple's 30% commission for use of Apple's optional IAP system as a harm to consumers and competition more broadly.

Epic takes issue with the district court's proper consideration of Apple's procompetitive justifications and its finding that those justifications outweigh any anticompetitive effects of Apple's business model. But Epic's case fails at step one of the rule of reason analysis. Indeed, Epic did not demonstrate that Apple's app distribution and IAP practices caused the significant *market-wide* effects that the Supreme Court in *Ohio v. Am. Express Co. ("Amex")* deemed necessary to show anticompetitive harm in cases involving two-sided transaction markets. 138 S. Ct. 2274, 2285–86 (2018). While the district court found that Epic demonstrated *some* anticompetitive effects, Epic's arguments below focused only on the effects that Apple's conduct had on certain *app developers* and failed to appropriately examine

2

whether consumers were harmed overall. This is fatal. Without further evidence of the effect of Apple's app distribution and IAP practices on consumers, no conclusions can be reached about the competitive effects of Apple's conduct.

Nor can an appropriate examination of anticompetitive effects ignore output. It is critical to consider whether the challenged app distribution and IAP practices reduce output of market-wide app transactions. Yet Epic did not seriously challenge that output increased by every measure, and Epic's *Amici* ignore output altogether.

Moreover, the district court examined the one-sided anticompetitive harms presented by Epic, but rightly found that Apple's procompetitive justifications outweigh any purported anticompetitive effects in the market for mobile gaming transactions. The court recognized that the development and maintenance of a closed iOS system and Apple's control over IAP confers enormous benefits on users and app developers.

Finally, Epic's reliance on the theoretical existence of less restrictive alternatives ("LRA") to Apple's business model is misplaced. Forcing Apple to adopt the "open" platform that Epic champions would reduce interbrand competition, and improperly permit antitrust plaintiffs to commandeer the judiciary to modify routine business conduct any time a plaintiff's attorney or district court can imagine a less restrictive version of a challenged practice, irrespective of whether the practice promotes consumer welfare. *See NCAA v. Alston*, 141 S. Ct.

3

2141, 2161 (2021) ("[C]ourts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'"). Particularly in the context of two-sided platform businesses, such an approach would sacrifice interbrand, systems-level competition for the sake of a superficial increase in competition among a small subset of platform users.

## I. The Framework for Assessing Competitive Effects in a Two-Sided Market Requires a Broad Examination of the Market as a Whole

In *Amex*, the Supreme Court stressed that a unique analysis of anticompetitive effects is necessary when a plaintiff alleges an antitrust violation in a two-sided transaction market. *See* 138 S. Ct. at 2285–86. Two-sided markets connect two distinct sets of users whose demands for the platform are interdependent—*i.e.*, consumers' demand for a platform increases as more products are available, and, conversely, product developers' demand for a platform increases as additional consumers use the platform, increasing the overall potential for transactions. Due to the complex dynamics unique to two-sided markets, conduct may appear anticompetitive when the effects on only one set of customers is considered, but when the effects on both sides are examined may prove to be entirely consistent with—and actually promote—healthy competition. *See* Geoffrey A. Manne, *In Defence of the Supreme Court's "Single Market" Definition in* Ohio v American Express, 7 J. OF ANTITRUST ENF'T 104, 110 (2019) [hereinafter *In Defence of Amex*] ("[E]vidence of a price effect on only one side of a two-sided platform can be

4

consistent with either neutral, anticompetitive, *or* procompetitive conduct."). The Supreme Court thus recognized that it is improper to assess the presence of anticompetitive effects by focusing on only one side of a two-sided market. *Amex*, 138 S. Ct. at 2287 ("Evidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power").

Indeed, even scholars critical of *Amex* recognize the importance of considering effects on both sides of a two-sided market. In their paper arguing strenuously against the Court's two-sided market definition in *Amex*, for example, Michael Katz and Jonathan Sallet acknowledge that "in assessing whether a hypothetical monopolist selling newspapers to readers would find a [small significant non-transitory increase in price ("SSNIP")] profitable, one would have to consider the effects on advertising revenues in addition to effects on subscription revenues . . . . In this regard, considering prices on both sides of a platform (even if the prices are in separate markets) is much less novel than it may appear." Michael Katz & Jonathan Sallet, *Multisided Platforms and Antitrust Enforcement*, 127 YALE L.J. 2142, 2160 (2018).

The district court in this case properly concluded that app stores are two-sided transaction platforms and stressed the importance of examining such a market broadly. *See* 1-ER97–98 ("In two-sided transaction markets, an anticompetitive

price or restriction on one side may well reflect a competitive equilibrium on the other side. Thus . . . competitive effects can only be determined after carefully considering both sides of the transaction (developers and users), including any indirect network effects."). Indeed, "[g]iven the differential incidence of price and quality across a platform, it is impossible to capture the competitive dynamics and to measure the competitive effects by viewing only the partial price on one side." *In Defence of Amex, supra* page 4, at 109; *see also generally* David S. Evans & Richard Schmalensee, *The Antitrust Analysis of Multi-Sided Platform Businesses*, in OXFORD HANDBOOK ON INTERNATIONAL ANTITRUST ECONOMICS 405 (Roger Blair & Daniel Sokol eds., 2013). Thus, the district court appropriately criticized Epic's attempts to prove anticompetitive effects on only one side of a two-sided platform, noting that the SSNIP analysis performed by Epic's expert, David Evans, was "fatally flawed by several standards, including his own." 1-ER60 (stressing failure of Dr. Evans to test both sides of market after acknowledging that he must).

## A. Epic Presents Evidence of Supracompetitive Prices on Only One Side of a Two-Sided Transaction Market

Epic claims to have identified certain anticompetitive effects suffered by developers that are sufficient to satisfy its burden under the first step of the rule of reason. Opening Br. for Appellant, Cross-Appellee Epic Games, Inc. ("Epic Br.") at 39, *Epic Games, Inc. v. Apple Inc.*, Nos. 21-16506 & 21-16695 (9th Cir. Jan. 20, 2022), ECF No. 41. But, by failing to discuss the net effects on consumers, neither

6

Epic nor the district court properly analyze the alleged anticompetitive effects of Apple's conduct in the manner prescribed by *Amex*. Rather, Epic's argument inappropriately divorces inherently intertwined aspects of the market. Epic cannot lessen its step one burden by artificially dividing the market, and then purporting to show harm in only one market segment. *See Heisen v. Pac. Coast Bldg. Prods.*, 1994 U.S. App. LEXIS 14332, at \*5 (9th Cir. June 9, 1994) (finding failure to allege harm to market as a whole fatal to Sherman Act claims).

Incredibly, and in direct contravention of *Amex*, certain *Amici* argue that the district court's finding regarding the price paid by developers is alone "sufficient for Epic to meet its burden under the rule of reason."[2] But the Supreme Court has already rejected this, and Epic's failure to present evidence demonstrating that Apple's conduct resulted in higher prices to consumers is fatal to its claims. Indeed, the district court's opinion supports a finding of only "*some* anticompetitive effects," (1-ER147)—not "substantial anticompetitive effects"—all seemingly focused on the developer side of the two-sided market. *See, e.g.*, 1-ER102 (noting court "must reserve on whether Apple's restrictions have increased prices for consumers as the

---

[2] Br. of *Amici Curiae* 38 L., Econ., & Bus. Professors at 2–5, *Epic Games, Inc. v. Apple Inc.*, Nos. 21-16506 & 21-16695 (9th Cir. Jan. 27, 2022), ECF No. 35 [hereinafter, "Epic *Amici*" and "Epic *Amici* Br."].

evidence is mixed").  The broader analysis required by *Amex* reveals that Epic did not in fact meet such a burden.

For instance, the district court observed that the 30% commission Apple charges *to developers* appeared to be "artificially high" (1-ER147), but made no finding that prices paid by consumers went up or were otherwise higher than they would have been in a more competitive market.  Under *Amex,* an increased price on one side of the market may be an *element* of a *prima facie* case, but (contrary to arguments by Epic *Amici,* (*see* Epic *Amici* Br. at 4)) it is insufficient on its own to establish anticompetitive effects on net.  The necessary *Amex* showing requires consideration of the totality of effects, not just those occurring in one small segment of the platform.

The underlying economic logic is that, in two-sided markets, supracompetitive prices on one side do not tell us much about the existence or exercise of market power.  *See* 1-ER93 (referencing economist's opinion that two-sided platforms have "skewed pricing so supracompetitive prices on one side may not be indicative").  "By being able to balance the interests of the two sides through its pricing structure, a proprietary platform may come closer to the socially optimal level of adoption than a platform simply pricing at marginal cost on both sides." Andrei Hagiu, *Proprietary vs. Open Two-Sided Platforms and Social Efficiency* at 19 (AEI-Brookings Joint Ctr. for Regul. Stud., Working Paper No. 06-12, 2006)

[hereinafter *Proprietary vs. Open Platforms*]; *see also Amex*, 138 S. Ct. at 2285–86 ("Price increases on one side of the platform likewise do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services." (citing Benjamin Klein et al., *Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73 ANTITRUST L.J. 571, 574, 595, 598, 626 (2006))).

Moreover, the exercise of market power is not by itself sufficient to establish anticompetitive effects. Indeed, contrary to what Epic *Amici* imply, the court's conclusion that Apple employs policies that allow it to "extract supracompetitive commissions from this highly lucrative gaming industry" (1-ER121), is not a finding of anticompetitive harm. Rather, it suggests that Apple enjoys a degree of market power and charges prices accordingly—which, of course, is not illegal. Nor does it meet a plaintiff's burden, especially where the district court could not "conclude that Apple's market power reaches the status of monopoly power in the mobile gaming market." 1-ER142.

## B. The Lack of Any Demonstrable Reduction in Output Undermines Epic's Allegations of Harm

The ability to restrict output is what allows a monopolist ultimately to increase prices. *See, e.g.*, PHILIP E. AREEDA, ET AL., ANTITRUST LAW, AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 501 (4th ed. 2017) ("Market power is the ability to raise price profitably by restricting output."); *Rebel Oil Co. v.*

*Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("Prices increase marketwide in response to the reduced output because consumers bid more in competing against one another to obtain the smaller quantity available."); *Ball Memorial Hosp. v. Mutual Hosp. Ins*, 784 F.2d 1325, 1335 (7th Cir. 1986) ("Market power comes from the ability to cut back the market's total output and so raise price[.]"). Unlike prices—which might appear simultaneously as predatory on one side of the market and supracompetitive on the other—output tells us what is happening in the market *as a whole*. If market-wide output has decreased, that is evidence of a potential anticompetitive effect; if output has remained steady or increased, that is evidence of a healthy, competitive market. *See generally* Thomas A. Lambert, *A Decision-Theoretic Rule of Reason for Minimum Resale Price Maintenance*, 55 ANTITRUST BULL. 167 (2010) (explaining why output is the proper metric for antitrust analysis).

"What is material is whether Apple's overall pricing structure reduces output by deterring app developers from participating in the market or users from purchasing apps (or iOS devices at all) because of the amount of the app developer commission." Geoffrey A. Manne & Kristian Stout, *The Evolution of Antitrust Doctrine After* Ohio v. Amex *and the* Apple v. Pepper *Decision That Should Have Been*, 98 NEB. L. REV. 425, 457 (2019). But the district court found that it could not ascertain whether Apple's alleged restrictions had "a negative or a positive impact on game transaction volume." 1-ER103; *see also id.* (finding "no evidence that a

10

*substantial* number of developers forego making games because of Apple's commission."); 1-ER140 (finding Epic failed to show reduction in output and that "[t]he record contains substantial evidence that output has increased.").[3]

## C. Epic's Contentions that Apple's Conduct Decreased Innovation Are Also One-Sided

For similar reasons, Epic failed to prove anticompetitive effects by arguing that Apple's conduct "decreased innovation." 1-ER103–104. As made clear by the district court, Epic presented evidence to support only a finding that Apple's challenged restrictions slowed advancements of the tools that benefit *developers*— noting, for example, that developers often complain that Apple has been slow to adopt automated app review tools that could improve the speed and accuracy of their app review. 1-ER105. But the record is devoid of evidence to support a claim that *consumer-facing* innovation—or indeed innovation in the entire relevant market— has stalled. Even Epic *Amici* point to an alleged decrease in innovation among only developer-facing tools. Epic *Amici* Br. at 4. ("[T]he court. . . found '[d]ecreased

---

[3] Although the court observed that "iOS game transactions have exploded by 1,200% since 2008," it also determined that the record was insufficient to establish whether, in a hypothetical "but-for" scenario, the number of app transactions carried out would have been greater still. 1-ER102. This focus on the number of app transactions that may have occurred in a "but-for" setting is not the correct metric, however. As discussed below, identifying that some alternative conduct could conceivably benefit consumers even more is not relevant to the question whether challenged conduct is anticompetitive or not. *See infra*, § II.

innovation' *in 'core' game distribution services*.") (emphasis added). This is insufficient under *Amex* to prove market-wide anticompetitive effects.

Yet even with respect to the limited focus on developers, the district court specifically noted that Epic failed to present evidence that, because of Apple's 30% commission, "any developer actually stopped making games" for consumer use. 1-ER103. Nor does the record indicate that the apps that were published were of lower quality than they otherwise would have been. Rather, Epic's evidence was limited to the notion that Apple "is not moving quickly to address developer concerns or dedicating sufficient resources to their issues." 1-ER104. Again, this is an inappropriate effort to try to convert one group of platform users' *preferences* into evidence of anticompetitive harm.

## II. The "Less Restrictive Alternatives" Approach Relied Upon by Epic and Epic *Amici* Is Inconsistent with the Rule of Reason

Epic and Epic *Amici* contend that, because the district court identified some anticompetitive effects, and because "alternative models" could be implemented to achieve the procompetitive benefits of Apple's current business model, the court should have ruled in Epic's favor. *See* Epic *Amici* Br. §§ II, III; Epic Br. at 39–47. But they fail to point to *any* factual findings or record evidence to support the contention that Apple could have implemented these "alternative models" without significantly increasing the costs of doing business—focusing only on the proposed alternatives' hypothetical capacity to achieve benefits for developers like Epic. *See*

12

Epic *Amici* Br. at 14–18; Epic Br. at 39–47.  Such an approach is not supported by precedent and invites courts to exercise unbridled control over the business decisions of antitrust defendants.

Antitrust laws do not "give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415–16 (2004).  This is especially true with respect to LRAs—like the ones proposed here—that are based on maximizing competitor effectiveness by "opening" an incumbent's platform:

> This construction of antitrust law—that dominant companies must affirmatively support their fringe rivals' ability to compete effectively—adopts a perspective of antitrust that is regulatory in nature. . . . [I]f one adopts the increasingly prevalent view that antitrust must facilitate unfettered access to markets, thus spurring free entry and expansion by incumbent rivals, the Sherman Act goes from being a prophylactic device aimed at protecting consumers against welfare-reducing acts to being a misplaced regulatory tool that potentially sacrifices both consumer welfare and efficiency in a misguided pursuit of more of both.

Alan Devlin, *Antitrust as Regulation*, 49 SAN DIEGO L. REV. 823, 830 (2011).

Even monopolists are entitled to make independent business decisions, and courts (and competitors) are ill-suited "to act as central planners, identifying the proper . . . terms of dealing." *Trinko*, 540 U.S. at 408; *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 452–53 (2009) (quoting *Trinko*, 540 U.S. at 408). The legal regime proposed by Epic and Epic *Amici*, which would allow courts and

competitors to second-guess every business decision unless it achieved a certain competitive outcome, would overturn the antitrust rule of reason. *See Alston*, 141 S. Ct. at 2161 ("To know that the Sherman Act prohibits only unreasonable restraints of trade is thus to know that attempts to '[m]ete[r] small deviations is not an appropriate antitrust function.'" (alteration in original) (*quoting* Herbert Hovenkamp, *Antitrust Balancing*, 12 N.Y.U. J.L. & BUS. 369, 377 (2016))).

## A. The Less Restrictive Alternatives Test Is Particularly Inappropriate in the Context of Two-Sided Platform Markets

The rule of reason requires plaintiffs to show that any anticompetitive effects are not outweighed by procompetitive justifications—in other words, that the complained-of practice causes a net harm. The existence of an LRA that might tip the scales somewhat *further* to the benefit of consumers or competitors does not necessarily indicate that the contested approach is anticompetitive. *See Alston*, 141 S. Ct. at 2161 (finding businesses are not required to use "anything like the least restrictive means of achieving legitimate business purposes"); *Smith v. Pro Football*, 593 F.2d 1173, 1215 (D.D.C. 1978) (MacKinnon, J., concurring in part, dissenting in part) ("In evaluating less restrictive alternatives as a matter of law, it is difficult to imagine what kind of draft would be valid if the existence of a less restrictive alternative would automatically render the present draft unreasonable. Some less restrictive alternative can always be imagined."); *see also* PHILIP E. AREEDA, ET AL., ANTITRUST LAW, AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION

14

¶ 1913b (4th ed. 2018) ("A skilled lawyer would have little difficulty imagining possible less restrictive alternatives to most joint arrangements."). Such an approach would overreach. *See* Devlin, *supra* page 13 at 876 ("Given the ex post posture in which courts operate . . . it is perhaps unsurprising that judges would seek to engineer superior market outcomes when they can identify less restrictive alternatives to impugned conduct. The danger, however, is at once subtle, systemic, and serious.").

But even if an LRA analysis is appropriate in some contexts to identify anticompetitive conduct in the face of procompetitive justifications, LRA analysis is particularly problematic in the context of two-sided markets because it would inevitably require courts to second guess the particular allocation of costs, prices, and product attributes across platform users. "Platform defendants, even if they are able to establish the general procompetitive justifications for charging above and below cost prices on the two sides of their platforms, will have to defend the precise combination of prices they have chosen [under an LRA approach] . . . . The relative difficulty of defending any particular allocation of costs will present considerable risk of destabilizing platform markets." Thomas B. Nachbar, *Less Restrictive Alternatives and the Ancillary Restraints Doctrine*, 45 SEATTLE U. L. REV. (forthcoming 2022) (draft available at https://ssrn.com/abstract=3723807). The Ninth Circuit has never applied such a test in the two-sided market context.

To avoid judicial overreach, LRAs should thus be considered, as in *Alston*, only when the challenged restraints are "'patently and inexplicably stricter than is necessary' to achieve the procompetitive benefits" proffered by a defendant. *Alston*, 141 S. Ct. at 2147, 2162 (noting that such a strict standard would prevent a "future filled with judicial micromanagement of legitimate business decisions"); 1-ER151; *see also* 1-ER150–51 (recognizing proposed LRAs must be "*significantly* (not marginally) less restrictive" and "virtually as effective in serving the procompetitive purposes . . . without significantly increased cost.") (emphasis added). That is not the case here, where the district court rightly held that "Apple's business choice . . . is reasonable." 1-ER152.

Further, only in the third step of the rule of reason, *i.e.*, after the plaintiff has carried its burden to prove anticompetitive effects, and after the defendant has proven that those effects are outweighed by procompetitive benefits, is it even potentially appropriate to consider LRAs. *See* 1-ER150–51 n.610. Thus, as here—and in *Amex*—where a plaintiff has not carried its burden of proof to demonstrate anticompetitive effects on both sides of a two-sided platform, the court should not evaluate the challenged conduct compared to hypothetically less restrictive alternative practices that are irrelevant to the step one analysis. *See Amex*, 138 S. Ct. at 2284 (noting in dictum that "less anticompetitive means" can be considered in

16

third step of the rule of reason, but declining to do so because the plaintiff failed to show anticompetitive effects in step one).

## B. Epic's Proposed Approach to IAP Amounts to Inappropriate Regulation of Unilateral Pricing Decisions

The flaws of Epic's and Epic *Amici*'s preferred LRA approach are apparent in its application to Apple's IAP. According to Epic, Apple could simply lift restrictions on the use of third-party IAP processors (*e.g.*, Visa and MasterCard), but still be appropriately compensated for the use of its intellectual property, ensure that iPhone users' IAP are sufficiently secure, and guarantee quality—all with significantly fewer restrictions to competition. 1-ER153; Epic Br. 44–47. But exactly how Apple could achieve these ends without increasing its costs is a question Epic did not try to answer. *See, e.g.*, 1-ER151 (noting that Epic's requests for relief "leave unclear whether Apple can collect licensing royalties and, if so, how it would do so"); 1-ER153 & n.617 (noting it would "be more difficult" and more costly for Apple to collect commission without IAP system). Nor did Epic, the Epic *Amici*, or the district court properly address the effect of the proposed LRAs on *consumers*— as opposed to competing developers. *See* 1-ER102 (recognizing that launch of competing app distribution platforms on iOS could result in lower prices for consumers or higher profits for app developers); 1-ER148 n.605 (noting it is "unclear the extent or degree to which developers would pass on any savings to consumers").

17

For instance, consistent with Epic's proposed approach, Apple could allow independent payment processors to compete, charge an all-in fee of 30% when Apple's IAP is chosen, and, in order to recoup the costs of developing and running its App Store, charge app developers a reduced, mandatory per-transaction fee (on top of developers' "competitive" payment to a third-party IAP provider) when Apple's IAP is not used. Indeed, where such a remedy has been imposed already, that is exactly what Apple has done. In the Netherlands, where Apple is required by the Authority for Consumers and Markets ("ACM") to uncouple distribution and payments for dating apps, Apple has adopted the following policy:

> Developers of dating apps who want to continue using Apple's in-app purchase system may do so and no further action is needed. . . . Consistent with the ACM's order, dating apps that . . . use a third-party in-app payment provider will pay Apple a commission on transactions. Apple will charge a 27% commission on the price paid by the user, net of value-added taxes. This is a reduced rate that excludes value related to payment processing and related activities.

APPLE, *Distributing dating apps in the Netherlands,* https://developer.apple.com/support/storekit-external-entitlement/ (last visited Mar. 30, 2022).

It is not hard to see the fundamental problem with this approach. If a 27% commission plus competitive payment-provider fee permits more "competition" than complete exclusion of third-party providers, then surely a 26% fee would permit even more competition. And a 25% fee more still. Such a hypothetical exercise logically ends only where a self-interested competitor or customer wants it to end,

18

and is virtually impossible to measure. Even if it were possible, it would entail precisely the kind of price management that *Trinko* says is antithetical to the antitrust laws.

Further, consider what would happen if Epic's proposed LRA approach were imposed: The next third-party payment provider would argue that its minimum viable price for providing its services on the App Store is 4%—and thus that it is effectively excluded from competition if Apple is allowed to levy a 27% fee on app developers while also offering its own, all-in "distribution plus payments" service at 30%. Applying the logic of Epic's proposed LRA test, such a hypothetical payment provider presumptively would win its case.

But clearly it should not, because on these facts it is not as efficient a competitor as Apple, and consumers are better off with Apple's offering than with artificially imposed "competition" plus further restrictions on Apple's offering. The problem, of course, is that the rigidity of Epic's proposed LRA approach would prevent consideration of these marketplace realities.

### C. "Open" Platforms Are Not Inherently More or Less Restrictive than "Closed" Platforms

1. Apple's "Open" System Advances the Primary Purpose of Antitrust Law: Interbrand Competition

US antitrust law is unequivocal in its preference for interbrand over intrabrand competition. "A demonstrable benefit to interbrand competition will outweigh the

harm to intrabrand competition that is caused by the imposition of vertical nonprice restrictions on dealers." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 748–49 (1988) (Stevens, J., dissenting) (summarizing the Supreme Court's holding in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977)). The underlying economic logic, now antitrust orthodoxy, is that "when interbrand competition exists . . . it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Sylvania*, 433 U.S. at 52 n.19.

Centralized app distribution and Apple's "walled garden" model (including IAP) increase interbrand competition because they are at the core of what differentiates Apple from Android. 1-ER148–49. They play into Apple's historical business model, which focuses on being user-friendly, reliable, safe, private, and secure. 1-ER86; *see also* 1-ER107 (recognizing that the safety and security of Apple's closed system is a "competitive differentiator for its devices and operating system"). Even Epic's CEO, Tim Sweeney, recognized that Apple would lose its competitive advantage if it were to compromise its safety and security features. 1-ER48 n.250 (noting Epic's expert, Susan Athey, testified that "privacy and security are competitive differentiators for Apple").

For Apple (and its users), the touchstone of a good platform is not "openness," but carefully curated selection and security, understood broadly as encompassing the

removal of objectionable content, protection of privacy, and protection from "social engineering," and the like. 1-ER148–49. By contrast, Android's bet is on the open platform model, which sacrifices some degree of security for the greater variety and customization associated with more open distribution. These are legitimate differences in product design and business philosophy. *See Proprietary vs. Open Platforms*, *supra* page 8, at 2–3 (explaining that there is a "fundamental welfare tradeoff between two-sided proprietary . . . platforms and two-sided open platforms, which allow 'free entry' on both sides of the market" and thus "it is by no means obvious which type of platform will create higher product variety, consumer adoption and total social welfare"); Jonathan M. Barnett, *The Host's Dilemma: Strategic Forfeiture in Platform Markets for Informational Goods*, 124 HARV. L. REV. 1861, 1927 (2011) ("Open systems may yield no net social gain over closed systems, can impose a net social loss under certain circumstances, and . . . can impose a net social gain under yet other circumstances.").

Because consumers and developers could reasonably prefer either ecosystem, it is not clear that loosening Apple's control over the App Store would necessarily lead to more app transactions market-wide. Indeed, in a two-sided market context, a "proprietary platform may in fact induce more developer entry (i.e., product variety), user adoption and higher total social welfare than an open platform." *Proprietary vs. Open Platforms*, *supra* page 8, at 16. In other words, preventing

21

certain apps from accessing the App Store, and preventing certain transactions from taking place on it, may ultimately have *increased* the number of apps and transactions on Apple's platform, because doing so made it attractive to a wider set of consumers and developers.

Nevertheless, Epic argues that Apple should have to implement Epic's preferred "open" system, effectively rendering Apple's platform much more similar, if not identical, to Android's. Under the guise of fostering competition on Apple's platform, which, as the district court found, is *not* a monopoly, this *de facto* standardization would instead eliminate competition where it matters most, *i.e.*, at the interbrand, systems level. *See* Michael L. Katz & Carl Shapiro, *Systems Competition and Network Effects*, 8 J. Econ. Persps. 93, 110 (1994) ("[T]he primary cost of standardization is loss of variety: consumers have fewer differentiated products to pick from, *especially if standardization prevents the development of promising but unique and incompatible new systems*" (emphasis added)). By limiting intrabrand competition, in other words, Apple ultimately promotes interbrand competition.[4] 1-ER148–49.

---

[4] The overwhelming irony of Epic's proposed approach is that Apple could avoid condemnation if it made its overall platform *more* restrictive. If, for example, Apple had not adopted an App Store model and offered a completely closed and fully integrated device, there would be no question of relative costs and benefits imposed on independent app developers; there would be no independent developers on the iOS platform. Thus, Epic's proposed LRA approach, which amounts to converting iOS

Relying heavily on *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978), Epic *Amici* attempt to sweep the district court's findings on interbrand competition under the rug, arguing that antitrust law does not recognize enhanced product quality as a cognizable procompetitive justification, and Apple did not show that its interest in security and privacy would "enable *Apple* to compete effectively with Android or other rivals." Epic *Amici* Br. at 6–14.

These arguments fail twice over. First, many antitrust cases hinge on product quality, particularly where unfettered competition results in market failures that impede the provision of higher quality products. *See Sylvania*, 433 U.S. at 71 n.23 (recognizing that "society increasingly demands that manufacturers assume direct responsibility for the safety and quality of their products" and the "legitimacy of these concerns has been recognized in cases involving vertical restraints"); *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (establishing that defendants may offer as a valid procompetitive justification that alleged restraint "enhance[s] consumer appeal"). Indeed, *Professional Engineers*'s findings regarding "safety" as a procompetitive justification are inapposite, here. In that case,

---

to an open platform, proves too much. It would enable any contractual or employment relationship for a complementary product or service to be challenged because it could be offered through a "less restrictive" open market mechanism—in other words, that any integrated firm should be converted into an open platform. That is not the law, nor would it be beneficial for consumers if it were. It would also thwart ecosystem competition between two legitimate platforms models.

the Supreme Court considered whether a professional association's ethical rule, prohibiting competitive bidding by all providers in its industry, could be justified by the notion that low bids might encourage cost-cutting measures that compromise public safety. 435 U.S. at 694–95. But where the industry-wide safety measures being imposed in *Professional Engineers* limit interbrand competition, Apple does not force its safety, security, and privacy standards on other app transaction platforms in the relevant market. Its competitors are free to, and do, take a different approach.

Moreover, *Professional Engineers* itself, "when read properly," allows defendants to plausibly argue "that, absent the restriction, one or more departures from the assumptions of perfect competition would lead unbridled rivalry to produce a market failure." Alan J. Meese, *Competition and Market Failure in the Antitrust Jurisprudence of Justice Stevens*, 74 FORDHAM L. REV. 1775, 1790–91 (2006). As the comparison between Android's open (*i.e.*, relatively unfettered) distribution platform and Apple's closed platform attests, this case presents precisely the situation in which unrestrained competition would likely preclude the availability of a competing product (Apple's safer and more secure "walled garden" platform) that would enhance consumer welfare.

Second, Epic *Amici*'s claim that Apple failed to show that security and privacy enabled it to compete is specious. As noted above, the district court, Epic's CEO,

24

and Epic's experts all recognized that the security and privacy guaranteed by Apple's closed iOS system enable it to compete with Android's open platform. 1-ER107; 1-ER48 n.250. Security issues with third-party apps offered on the App Store will necessarily affect the user experience and have a direct impact on Apple's ability to compete. The Epic *Amici* dismiss these realities, arguing that Apple's arguments are like those of an automobile manufacturer claiming that restrictions on competition are necessary to ensure the availability of "higher-quality cars . . . with . . . more reliable and safer brakes," and that "[s]uch contentions—similar to those offered by Apple—would be dismissed." Epic *Amici* Br. at 7–8. But Apple is more akin to a car *dealer* that limits the cars it will sell to ensure the safety of each of the cars sold on its lot. While such restrictions might appear to limit competition among automobile manufacturers—and to disadvantage manufacturers that sell unsafe cars—a dealer's reputation for selling safe vehicles will inevitably help it to compete against less-careful competitors. Such interbrand quality competition will ultimately enhance, not diminish, competition. And indeed, protecting such interbrand competition is the "primary purpose" of antitrust law. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007) ("The primary purpose of the antitrust laws is to protect this type of [interbrand] competition.")

    2.   Epic's Proposed LRA Ignores Intra-Group Trade-Offs Among Developers and Among Consumers

Epic and Epic *Amici* also ignore the intra-group trade-offs *among* consumers and developers in claiming that Epic's proposed LRA would be a viable alternative to Apple's business model. Even if an open platform led to more apps and IAP options for all consumers, some consumers may be better off as a result and others may be worse off. More vigilant users may avoid downloading apps and using IAP systems that are unreliable or which impose invasive data-sharing obligations, but less vigilant users will fall prey to malware, spyware, and other harmful content invited by an open system. The upshot is, "a more competitive market may be better at delivering to vigilant consumers what they want, but may end up exploiting more vulnerable consumers." Mark Armstrong, *Interactions Between Competition and Consumer Policy*, 4 COMPETITION POL'Y INT'L 97, 130 (Spring 2008).

There are similar tradeoffs to contend with on the developer side. Apple's model lowers the cost of joining the App Store, which particularly benefits small and non-game developers. As the court recognized, Apple's 30% IAP fee cross-subsidizes the delivery of services to the approximately 80% of apps that are free and that pay no IAP fees. In other words, developers who monetize through IAP, subsidize the rest of the App Store. 1-ER127 (discussing the allocation of prices among different app developers and noting that "game transactions . . . overwhelmingly subsidize other apps").

26

In addition, thanks to this model of cross-subsidization, every developer has access to the same high-quality distributor (the App Store) to distribute its products, and the same high-quality system for IAP. While Apple could choose a model that offers the best deals to the largest developers, applying the same conditions to all developers (or, more recently, better deals to *smaller* developers (1-ER38)) is a competitive strategy that has enabled Apple to attract as many quality developers as possible and may thus increase competition—a fact Epic failed to contend with. *See* 1-ER86 (recognizing that Apple must "make its platform attractive to developers"), 1-ER101 (recognizing failure to "grapple[] with the overarching issue of Apple's choice of model and how it subsidizes certain developers"). Indeed, the App Store also provides many other benefits which enable "small developers to compete with large ones," including developer tools, promotional support, advertising (72% of small developers lack a marketing budget), and a ready audience. *See* 1-ER99.

If Apple allowed competing app stores and payment processors, it would have to employ a different model to finance the App Store and gather its commission, and it may be more difficult or impossible to effectively meter access charges according to developer size or extent of IAP usage. This would force Apple to forfeit many of the benefits that currently accrue to small developers, and there is no reason to believe this outcome would ultimately benefit consumers or developers as a whole, let alone the entire two-sided market. Indeed, Epic proposed no LRA for the

collection of such fees, let alone an alternative that would as effectively achieve the benefits for consumers and small developers of Apple's current model. *See* ER151–53 (recognizing that Epic left "unclear whether Apple can collect licensing royalties and, if so, how it would do so" and noting possible alternatives to collecting commission would "impose both increased monetary and time costs to both Apple and the developers").

The lesson from all of this is that, in a free market economy, companies, not courts, make product design decisions based on their business acumen and sound (or unsound) judgment. Only in narrow cases, such as where business decisions harm the public interest, are courts and public authorities empowered to intervene. By accepting Epic's proposed LRA, the Court would be making a product design choice that would not only dampen interbrand competition, but also have far-reaching distributive effects on both sides of the market. Some consumers and developers might be better off, but others will lose out. Courts are ill-suited to resolve these complex trade-offs. The district court was thus wise to show restraint and refuse to play the role of social planner absent a clear theory of harm, and faced with reasonable procompetitive justifications.

## CONCLUSION

Ultimately this case boils down to Epic wanting a free ride for its own Epic Games Store and its own IAP on iOS. It is thus no coincidence that the relief Epic

28

seeks is "a systematic change which would result in tremendous monetary gain and wealth [to itself]." 1-ER22. But Epic is not entitled to those gains unless it demonstrates that, by not adopting Epic's preferred business model, Apple has caused antitrust injury. It plainly has not. Epic has failed to demonstrate that Apple's conduct harms competition in the overall mobile ecosystem or even across both sides of the App Store's narrower two-sided market. Indeed, Epic's effort to meet this burden by demonstrating that Apple could conceivably operate its App Store in a "less restrictive" manner is entirely insufficient to satisfy the legal standard, even if it had adduced sufficient evidence. This Court should affirm the ruling of the district court.

Dated: March 31, 2022

*/s/ Jack E. Pace III*
Jack E. Pace III
Gina M. Chiappetta
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
jpace@whitecase.com
gina.chiappetta@whitecase.com

George L. Paul
Nicholas McGuire
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, D.C. 20005-3807
gpaul@whitecase.com
nicholas.mcguire@whitecase.com

*Counsel for* Amici Curiae *International Center for Law & Economics and Scholars of Law and Economics*

29

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,889 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: March 31, 2022

*/s/ Jack E. Pace III*
Jack E. Pace III
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
jpace@whitecase.com

*Counsel for* Amici Curiae *International Center for Law & Economics and Scholars of Law and Economics*

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: March 31, 2022

/s/ Jack E. Pace III
Jack E. Pace III
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
jpace@whitecase.com

*Counsel for* Amici Curiae *International Center for Law & Economics and Scholars of Law and Economics*

# ADDENDUM A
## List of Academic Signatories [*]

Alden Abbott
Senior Research Fellow, Mercatus Center, George Mason University
Former General Counsel, U.S. Federal Trade Commission

Thomas C. Arthur
L. Q. C. Lamar Professor of Law, Emory University School of Law

Dirk Auer
Director of Competition Policy, International Center for Law & Economics
Adjunct Professor, University of Liège (Belgium)

Jonathan M. Barnett
Torrey H. Webb Professor of Law, University of Southern California, Gould
School of Law

Donald J. Boudreaux
Professor of Economics, former Economics Department Chair, George Mason
University

Giuseppe Colangelo
Jean Monnet Chair in European Innovation Policy and Associate Professor of
Competition Law and Economics, University of Basilicata and Libera Università
Internazionale degli Studi Sociali

Anthony Dukes
Chair and Professor of Marketing, University of Southern California, Marshall
School of Business

Richard A. Epstein
Laurence A. Tisch Professor of Law, New York University, School of Law
James Parker Hall Distinguished Service Professor of Law Emeritus, University of
Chicago Law School

---

[*] The brief presents the views of the individual signers. Institutions are listed for
identification purposes only.

Vivek Ghosal
Economics Department Chair and Virginia and Lloyd W. Rittenhouse Professor of Economics, Rensselaer Polytechnic Institute

Janice Hauge
Professor of Economics, University of North Texas

Justin (Gus) Hurwitz
Professor of Law, University of Nebraska College of Law

Michael S. Jacobs
Distinguished Research Professor of Law Emeritus, DePaul University College of Law

Mark A. Jamison
Gerald Gunter Professor of the Public Utility Research Center, University of Florida, Warrington College of Business

Ben Klein
Professor of Economics Emeritus, University of California Los Angeles

Peter Klein
Professor of Entrepreneurship and Corporate Innovation, Baylor University, Hankamer School of Business

Jonathan Klick
Charles A. Heimbold, Jr. Professor of Law, University of Pennsylvania Carey Law School

Daniel Lyons
Professor of Law, Boston College Law School

Geoffrey A. Manne
President and Founder, International Center for Law & Economics
Distinguished Fellow, Northwestern University Center on Law, Business & Economics

Francisco Marcos
Associate Professor of Law, IE University Law School (Spain)

Scott E. Masten
Professor of Business Economics and Public Policy, University of Michigan, Ross Business School

Alan J. Meese
Ball Professor of Law, College of William & Mary Law School

Igor Nikolic
Research Fellow, Robert Schuman Centre for Advanced Studies, European University Institute (Italy)

Paul H. Rubin
Samuel Candler Dobbs Professor of Economics Emeritus, Emory University

Vernon L. Smith
George L. Argyros Endowed Chair in Finance and Economics and Professor of Economics and Law, Chapman University
Nobel Laureate in Economics (2002)

Michael Sykuta
Associate Professor of Economics, University of Missouri

Alexander "Sasha" Volokh
Associate Professor of Law, Emory University School of Law