# Nos. 21-16506 & 21-16695

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

EPIC GAMES INC. V. APPLE INC.

---

On Appeal from a Decision of the
United States District Court for the Northern District of California,
The Honorable Yvonne Gonzalez Rogers, No. 20-cv-05640

---

## BRIEF OF *AMICUS CURIAE*
## INTERNATIONAL CENTER FOR LAW & ECONOMICS
## IN SUPPORT OF DEFENDANT

---

MICHAEL E. HAMBURGER
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
mhamburger@whitecase.com

*Counsel for Amicus Curiae International
Center for Law & Economics*

June 20, 2023

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................ i

CORPORATE DISCLOSURE STATEMENT ........................................1

INTEREST OF THE *AMICUS CURIAE* ..............................................1

INTRODUCTION .................................................................................2

ARGUMENT ........................................................................................3

I.   ANTITRUST LAWS AND LAWS ON UNFAIR METHODS OF
     COMPETITION SHARE THE SAME GOAL: PROTECTING
     COMPETITION, NOT COMPETITORS .......................................3

     A.   The Unified Interpretation of UMC and Anticompetitive
          Conduct under the Antitrust Laws Is Well Established ......................6

     B.   The Connection Between Unfair Competition and
          Anticompetitive Conduct Is Recognized by California Courts ...........9

II.  APPLE'S ANTI-STEERING PROVISIONS CANNOT BE UNFAIR
     AS A MATTER OF LAW ...............................................................12

     A.   Unfairness under the UCL .................................................13

     B.   UMC under Claims Brought by Competitors ...................................15

     C.   The Answer to the "Unfairness" Question Is Anticipated by the
          Findings under Antitrust Law ...........................................16

CONCLUSION ....................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................................... 3

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) ................................................................. 11

*City of San Jose v. Off. of the Comm'r of Baseball*,
776 F.3d 686 (9th Cir. 2015) ................................................. 17

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) ................................................................... 5

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ................................... 12, 13, 18

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
703 F.2d 534 (9th Cir. 1983) ................................................. 18

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ............................................... 17

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................... 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................... 3

*New York v. Microsoft Corp.*,
224 F. Supp. 2d 76 (D.D.C. 2002) .......................................... 4

*NYNEX v. Discon*,
525 U.S. 128 (1998) ................................................................... 5

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
555 U.S. 438 (2009) ................................................................. 18

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ............................................................. 4, 5

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) (en banc) ............................................... 6

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .......................................................................... 2, 18

### STATE CASES

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ................................................................ passim

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (Cal. Ct. App. 2001) ...................... 8, 11, 12, 18

*Motors, Inc. v. Times Mirror Co.*,
102 Cal. App. 3d 735 (Cal. Ct. App. 1980) ....................................... 5

### FEDERAL STATUTES

Federal Trade Commission Act .......................................................... 6, 7, 8

Sherman Act ...................................................................................... 6, 7, 18

### STATE STATUTES

Cal. Bus. & Prof. Code § 17200 ............................................................. 9

California Unfair Competition Law ................................................... passim

California Unfair Practices Act ............................................................ 10

### MISCELLANEOUS

51 Cong. Rec. 11,105 (1914) ................................................................. 7

Geoffrey A. Manne & Daniel Gilman, *FTC UMC Authority: Uncertain Scope*,
Int'l Ctr. for L. & Econ. (Jan. 19, 2023) ............................................ 7

Gregory J. Werden, *Unfair Methods of Competition under Section 5 of the
Federal Trade Commission Act: What Is the Intelligible Principle?*,
Mercatus Center Working Paper 4, 19-22 (2023) ......................... 6, 7

Rudolf Callmann, *Unfair Competition and Antitrust: Coexistence Within
Complementary Goals*, 13 Antitrust Bull. 1335 (1968) ................... 3, 5

*Statement of FTC Commissioner Joshua D. Wright on the Proposed Policy Statement Regarding Unfair Methods of Competition under Section 5 of the Federal Trade Commission Act* (June 19, 2013)........................................6

William E. Kovacic & Marc Winerman, *Competition Policy and the Application of Section 5 of the Federal Trade Commission Act*, 76 Antitrust L. J. (2010)........................................................................8

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus International Center for Law & Economics states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.


Dated: June 20, 2023                    */s/ Michael E. Hamburger*

Michael E. Hamburger
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
mhamburger@whitecase.com

*Counsel for* Amicus Curiae *International Center for Law & Economics*

## INTEREST OF THE *AMICUS CURIAE*

The International Center for Law & Economics ("ICLE") is a nonprofit, non-partisan global research and policy center aimed at building the intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law and economics methodologies to inform policy debates and has longstanding expertise evaluating antitrust law and policy.

ICLE has an interest in ensuring that antitrust law promotes the public interest by remaining grounded in sensible rules informed by sound economic analysis. That includes ensuring consistency between antitrust law and other laws that proscribe unfair methods of competition, such as California's Unfair Competition Law.[1]

---

[1] ICLE represents that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than ICLE and its counsel—contributed money that was intended to fund preparing or submitting the brief. ICLE files this brief pursuant with consent of all parties.

## INTRODUCTION

The panel's holdings that (1) Apple's conduct with respect to its close control over the App Store and restrictions on in-app payments ("IAP") do not give rise to an antitrust violation, but that (2) its anti-steering provisions nevertheless violate California's Unfair Competition Law ("UCL"), are incongruent. The anti-steering provisions violate the UCL only if they constitute an "incipient violation of an antitrust law, or . . . [cause harm] comparable to or the same as a violation of the law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999). But provisions limiting app developers' ability to steer consumers to alternative payment options exist merely to further the goals of the lawful IAP restrictions, and thus the anti-steering provisions cannot constitute incipient antitrust violations or cause harm comparable to such violations.

Having affirmed the District Court's finding that Apple's IAP policies are procompetitive, the panel should have ruled that Apple's anti-steering provisions—which constitute a less restrictive means of pursuing the same procompetitive objective—are not unfair under the UCL. The panel's decision, if it stands, risks chilling procompetitive conduct by deterring investment in efficiency-enhancing business practices, such as Apple's "walled-garden" iOS. *See Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) ("[F]alse condemnations 'are especially costly, because they chill the very conduct the

antitrust laws are designed to protect.'") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)).  More egregiously, it risks creating a fundamental contradiction by enjoining conduct under the UCL that is benign—and even beneficial—under antitrust law.

## ARGUMENT

## I. ANTITRUST LAWS AND LAWS ON UNFAIR METHODS OF COMPETITION SHARE THE SAME GOAL: PROTECTING COMPETITION, NOT COMPETITORS

Antitrust and other laws aimed at proscribing unfair methods of competition ("UMC") share the same overarching rationale, and thus "we can classify unfair competition and antitrust as blood brothers or, at least, as brothers-in-law."  Rudolf Callmann, *Unfair Competition and Antitrust: Coexistence Within Complementary Goals*, 13 Antitrust Bull. 1335, 1335 (1968).  Both types of laws were enacted to protect consumers by protecting "*competition*, not *competitors*." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (emphasis in original); *accord Cel-Tech,* 20 Cal. 4th at 186-87 (citing this language and defining "unfair" in the UCL to include incipient antitrust violations and other conduct that "*significantly threatens or harms competition*") (emphasis added).

Thus, while harm to a competitor may provide an *evidentiary* basis for demonstrating harm to competition under both antitrust and UMC laws, it is not sufficient for a viable claim under either.  Indeed, just as conduct that constitutes

vigorous competition in one context can cause anticompetitive harm in another, so too may conduct that harms a competitor promote competition overall. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458-59 (1993) ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself . . . . It is sometimes difficult to distinguish robust competition from conduct with long-term anticompetitive effects . . . ."); *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002) ("conduct that is in some respect adverse to competitors is almost implicit in the concept of competition"). In order to avoid condemning beneficial conduct, only a few forms of conduct are *per se* antitrust violations, and the vast majority are assessed based on their economic effects.

UMC law is nominally more focused on the nature of the conduct at issue— whether it is "unfair." As in antitrust, a few forms of conduct are facially problematic under UMC law. Most notably, conduct that violates some other law or policy may also violate UMC law.[2] But where the basis for an unfairness claim under UMC law is inchoate harm to competition, decades of scholarship and judicial decisions have made clear that the conduct should be assessed using the

---

[2] This is reflected in the UCL's language prohibiting "unlawful" conduct. *See Cel-Tech*, 20 Cal. 4th at 180 ("By proscribing 'any unlawful' business practice, '[the UCL] "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable.") (citations omitted).

same principles and effects-based logic of antitrust. "[A] rigid separation of the antitrust laws and the law of unfair competition is neither legally realistic nor economically desirable." Callmann, *supra*, at 1345.

The same is true under the UCL: "[T]he determination of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (Cal. Ct. App. 1980).

The logic is simple. Because consumers benefit from vigorous competition, antitrust law does not punish companies for competing on the merits, even if rivals are harmed or eliminated as a result. *See Spectrum Sports*, 506 U.S. at 458; *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 758, 767 (1984); *NYNEX v. Discon*, 525 U.S. 128, 135-36, 139 (1998). Using UMC laws to ban conduct merely because it harms competitors would risk undermining the very rationale of competition and, by extension, the UMC laws that seek to protect it. *See Cel-Tech*, 20 Cal. 4th at 185 (an improper definition of unfair "may even lead to the enjoining of *pro*competitive conduct and thereby undermine consumer protection, the primary purpose of the antitrust laws") (emphasis in original). Under UMC law as under antitrust law, "[c]ourts must be careful not to . . . prevent rigorous, but

fair, competitive strategies that all companies are free to meet or counter with their own strategies.  Companies that cannot compete with others that are more capable or efficient may lawfully fail." *Id.*

### A. The Unified Interpretation of UMC and Anticompetitive Conduct under the Antitrust Laws Is Well Established

As the California Supreme Court has held, in order to establish the meaning of "unfair" under the UCL, "we may turn for guidance to the jurisprudence arising under the 'parallel' Section 5 of the Federal Trade Commission Act.  'In view of the similarity of language and obvious identity of purpose of the two statutes, decisions of the federal court on the subject are more than ordinarily persuasive.'" *Cel-Tech,* 20 Cal. 4th at 185 (citations omitted).

"As with the Sherman Act, conduct challenged under Section 5 'must have an "anticompetitive effect."'  That is, it must harm the competitive *process* and thereby harm consumers.  In contrast, harm to one or more *competitors* will not suffice.'"  *Statement of FTC Commissioner Joshua D. Wright on the Proposed Policy Statement Regarding Unfair Methods of Competition under Section 5 of the Federal Trade Commission Act*, at 7 (June 19, 2013) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc)).

Indeed, in the more than 100 years of history interpreting the FTC Act, "[a]n understanding emerged that the FTC's UMC authority reached somewhat beyond the Sherman Act, but was still tethered to the central antitrust concepts of the

consumer welfare standard and the 'rule of reason,' both of which offer courts a means to evaluate the legality of market behavior in terms of its likely harms and benefits."  Geoffrey A. Manne & Daniel Gilman, *FTC UMC Authority: Uncertain Scope*, Int'l Ctr. for L. & Econ. (Jan. 19, 2023), https://laweconcenter.org/resources/ftc-umc-authority-uncertain-scope/.

The legislative history of the FTC Act makes clear its alignment with the principle of "harm to competition, not competitors" undergirding antitrust law: "The unfairness must be tinctured with unfairness to the public; not merely with unfairness to the rival or competitor . . . .  We are not simply trying to protect one man against another; we are trying to protect the people of the United States, and of course, there must be in the imposture or in the vicious practice or method something that has a tendency to affect the people of the country or be injurious to their welfare."  51 Cong. Rec. 11,105 (1914) (Remarks of Senator Cummins).

Scholars have developed a robust body of work confirming that the FTC Act was meant to supplement the Sherman Act.  *See, e.g.*, Gregory J. Werden, *Unfair Methods of Competition under Section 5 of the Federal Trade Commission Act: What Is the Intelligible Principle?*, Mercatus Center Working Paper 4, 19-22 (2023).  And even former FTC Chairman William Kovacic has written that the FTC "should not . . . rely on the assertion . . . that the Commission could use its UMC authority to reach practices outside both the letter and spirit of the antitrust

laws."  William E. Kovacic & Marc Winerman, *Competition Policy and the Application of Section 5 of the Federal Trade Commission Act*, 76 Antitrust L.J. 929, 945 (2010).

While these statements relate to federal statutes, the more general point on the shared rationale between antitrust and unfair competition laws extends beyond the specific relationship between the Sherman and Clayton Acts on the one hand, and the FTC Act on the other.  In fact, the California Court of Appeals has explicitly endorsed this view, finding that, where the same conduct is "alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers."  *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (Cal. Ct. App. 2001).

True, in *Cel-Tech* an "unfair" claim was allowed to proceed despite the plaintiff failing to make out an antitrust violation.  *Cel-Tech*, 20 Cal. 4th 163.  But *Cel-Tech* is the rare case where anticompetitive conduct—below cost sales—may be actionable under the UCL but not under antitrust law because of the idiosyncratic structure of the industry and the regulatory context.  *See id.* at 189 ("This case has an unusual circumstance that might bring it within the unfair competition law's coverage. . . . '[F]air and honest competition' in equipment sales

might not be possible when a legally privileged company sells equipment below cost as a strategy to increase profits on service sales that are prohibited to its equipment competitors."). Ultimately, however, the underlying logic of the UCL and antitrust claims in *Cel-Tech* was rooted in the same unified goal: protecting competition.

The case at hand, however, is fundamentally different. Here, Epic is essentially asking that Apple be forced to aid its competitors, a position that is contrary to the ethos of both antitrust law *and* the UCL.

## B.  The Connection Between Unfair Competition and Anticompetitive Conduct Is Recognized by California Courts

The UCL contains three distinct bases for establishing a violation, two of which are relevant here: "unfair competition shall mean and include any *unlawful*, *unfair* or fraudulent business act or practice . . . ." Cal. Bus. & Prof. Code § 17200 (emphasis added).[3]  But the panel erred when it declared that requiring a violation of antitrust law would collapse the unlawful and unfair prongs of this disjunctive standard. While there is inevitably overlap between the assessment of antitrust law

---

[3] It is worth noting that the dissenting opinion in *Cel-Tech* takes issue with the majority's decision that the "unfair" prong of the UCL means anything other than "deceptive." Under this reading of the UCL, of course, there would be no basis for the district court or the panel's finding that Apple's conduct violated the UCL. *See Cel-Tech*, 20 Cal. 4th at 192 (Kennard J. dissenting) ("The purpose of the legal prohibitions against *unfair business acts and practices*, by contrast, is to prevent deceptive conduct that injures a particular competitor.").

under the two prongs (because "unfairness" inherently imports antitrust concepts and standards), the "unlawful" prong is not rendered a nullity by the role of antitrust standards in assessing the unfairness prong because that prong relates to laws other than antitrust. Actual violations of antitrust law may also constitute violations of the UCL. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 267 (S.D.N.Y. 2019) ("Because I have concluded that the IPPs have adequately pleaded that Keurig's conduct was an unfair restraint of trade, I also conclude that they have adequately pleaded that it was unfair under the California Unfair Competition Law.").

Thus, the court in *Cel-Tech* first addressed potential non-antitrust sources of harm and then considered the role of antitrust law only in its exegesis of the "unfair" prong of the UCL. That is why the decision considered whether (1) any provision of the California Unfair Practices Act offers a basis for liability or provides a "safe harbor" from liability, or (2) stated policies of the California Public Utilities Commission could be undermined by the conduct in question. *Cel-Tech*, 20 Cal. 4th at 182-91.

The California Supreme Court then *separately* considered whether antitrust law might serve as a basis for liability, and did so under the "unfair" prong of the UCL. There, it established that "the word 'unfair' in [the UCL] . . . means conduct that threatens an incipient violation of an antitrust law, or violates the policy or

spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187. It is impossible to read this as holding that a violation of the "unfair" prong of the UCL can arise from conduct other than conduct that would violate the antitrust laws.

Most relevant here, the court strongly cautioned against imposing liability for conduct that would not otherwise be an antitrust violation because "[c]ourts must not prohibit 'vigorous competition' nor 'render illegal any decision by a firm to cut prices in order to increase market share." *Id.* at 189 (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986)). Doing so would lead to a harmful and improper incongruity between the UCL and the antitrust laws.

By the same token, in *Chavez* a California Court of Appeals held:

> If the same conduct is alleged to be both an antitrust violation and an "unfair" business act or practice for the same reason—because it unreasonably restrains competition and harms consumer—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers. To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct.

113 Cal. Rptr. 2d at 184. The panel asserts that this admonition is limited only to "categorical antitrust rule[s]." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1001 (9th Cir. 2023). But California's Second District Court of Appeals clarified that:

> [w]e do not hold that in all circumstances an "unfair" business act or practice must violate an antitrust law to be actionable under the unfair competition law. Instead we hold that conduct alleged to be "unfair" because it unreasonably restrains competition and harms consumers, such as the resale price maintenance agreement alleged here, is not "unfair" if the conduct is deemed reasonable and condoned under the antitrust laws.

*Chavez*, 113 Cal. Rptr. 2d at 184.

## II.    APPLE'S ANTI-STEERING PROVISIONS CANNOT BE UNFAIR AS A MATTER OF LAW

The litigation at hand is a case-study on why conduct that is procompetitive should not be enjoined under the UCL.

Apple's Guidelines included two types of anti-steering provisions that were aimed at preventing third-party apps from directing customers to purchasing mechanisms other than Apple's IAP: (1) a prohibition on links or buttons within third-party apps; and (2) a prohibition on targeted communications outside of the apps.

Apple has deleted (2) as part of the *Cameron v. Apple Inc.* settlement, meaning that developers are now free to communicate outside of the apps about external purchasing options (or anything else). *See* Order: Granting Mot. for Final

Approval of Class Action Settlement; Granting in Part and Denying in Part Mot. for Attorney's Fees, Costs, and Service Award; and Judgment at 12, No. 19-cv-03074 (N.D. Cal. June 10, 2022). What remains is the prohibition on links and buttons within apps. The question is therefore whether such a prohibition is unfair within the meaning of the UCL.

### A.   Unfairness under the UCL

The panel claims that the California Supreme Court has identified two tests to assess liability under the UCL's "unfair" prong: "First, to support 'any finding of unfairness to *competitors*,' a court uses the 'tethering' test . . . . Second, to support a finding of unfairness to *consumers*, a court uses the balancing test . . . ." *Epic Games*, 67 F.4th at 1000 (citations omitted).

But it is incorrect that the California Supreme Court has identified these two tests; rather, the California Supreme Court identified only the tethering test and left unsettled whether there should be a separate test for claims brought by consumers. *Cel-Tech*, 20 Cal. 4th at 187 n.12 ("This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers . . . .").

Despite the confusion generated by the *Cel-Tech* court's failure to provide a test for consumer-initiated claims under the UCL, ultimately it should not matter whether the case is resolved under the tethering test or the balancing test. As

discussed above, the aim of both the antitrust laws and UMC laws is to promote consumer welfare by protecting competition—regardless of whether the underlying conduct is in the first instance "unfair" to consumers or competitors. *See Cel-Tech*, 20 Cal. 4th at 186 (noting the aim of the test it enumerates to identify unfairness to *competitors* is "to promote consumer protection"); *see also id.* at 206 (Kennard, J. concurring and dissenting) ("The purpose of competition is to drive prices down. Although the unfair competition law protects competitors, even under the majority's definition it does not protect competitors at the expense of competition.").

Thus, while the evidentiary basis for claims brought by different parties may be distinct, the ultimate test of harm is not: finding injury to consumers. But even on this point, the supposed differences between the two tests are largely formalistic. The so-called "balancing test," which the panel asserts should apply to unfairness claims brought by consumers, is effectively the same as the burden-shifting, rule-of-reason assessment under antitrust law—which is similarly reflected in the "tethering test" applied to claims brought by competitors.

The anti-steering provisions therefore cannot be considered substantially injurious to consumers because it has already been established that consumers on the whole *benefit* from Apple requiring the use of its IAP.

## B.    UMC under Claims Brought by Competitors

Unfairness to *competitors* is explicitly resolved through the "tethering test," which asks whether the defendant's conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech,* 20 Cal. 4th at 186-87.

Any of these three bases for liability implicates harm to consumers, which antitrust law generally defines in terms of reduced output or increased prices for consumers.   The first basis for finding unfairness—an incipient violation of an antitrust law—concerns conduct that has not yet harmed consumers but is almost certain to do so in the future.

The second basis—the "policy or spirit" of antitrust law provision—is violated when conduct results in "effects [that] are comparable to or the same as a violation of" antitrust law.  *Id.* at 187.  Under this provision, whether anyone labels the challenged conduct an antitrust violation is irrelevant; instead, what matters is whether the conduct results in the same anticompetitive effects as an antitrust violation, and courts should pursue this inquiry as they would any other inquiry into the competitive effects of challenged conduct.

The third basis—conduct that "otherwise significantly threatens or harms competition"—is a catch-all meant to capture conduct that is permitted under the

antitrust laws but nevertheless results in harm to competition. The most obvious such circumstance is the very one assessed in *Cel-Tech* where the defendant was given a privileged legal status in the market at issue, and the threat was to a specifically defined form of competition under other laws or regulatory policies.

Accordingly, to resolve the question of whether Apple's anti-steering provision is unfair, an inquiry must be made into whether the conduct has anticompetitive effects—*i.e.*, whether it harms consumers by reducing output without concomitant procompetitive benefits—or whether it would, if left unchecked, likely develop into such an infringement.

### C. The Answer to the "Unfairness" Question Is Anticipated by the Findings under Antitrust Law

In rejecting Epic's claims under federal antitrust law, the district court and the panel have effectively foreclosed an unfairness claim under the UCL.

The panel found that Apple's walled-garden iOS, which prohibits third-party IAPs and app stores, did not violate federal antitrust laws because of its pro-competitive benefits: *i.e.*, increased user privacy and security that could not be achieved through less restrictive means and that ultimately increased inter-brand competition between Apple's iOS and its closest competitor, Android. In parallel, however, the panel concluded that Apple's anti-steering provisions, which prohibit apps from informing users about payment possibilities other than IAP, were unfair under the UCL.

In other words, Apple remains free to prohibit third-party IAPs based on the findings of procompetitive benefits, yet, at the same time, Apple is enjoined from prohibiting links or buttons to third-party payment mechanisms—a less-restrictive means of furthering the same objective. The two holdings cannot be reconciled.

The prohibition of links and buttons within the app is an enforcement mechanism for the prohibition of third-party IAPs. If Apple is allowed to require its own IAP on security and privacy grounds, then surely prohibiting apps from encouraging users to bypass Apple's IAP—by directing consumers to alternative payment methods which may be less secure or private—supports those same procompetitive benefits that the courts recognized. Other courts have correctly concluded that the same conduct cannot be both procompetitive and unfair. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1124 (9th Cir. 2018); *City of San Jose v. Off. of the Comm'r of Baseball*, 776 F.3d 686, 691-92 (9th Cir. 2015).

While the anti-steering provision and the requirement that Apple's IAP be used are not technically identical, they are both instrumental to achieving the same objective. Thus, even if the Ninth Circuit's conclusions under federal antitrust law on the IAP were not sufficient to *automatically* preclude a UMC claim related to the anti-steering provisions, an independent analysis under the UCL should—if done properly—reach the same conclusion: Apple's anti-steering provisions, like

its IAP exclusivity requirement, are procompetitive, do not harm competition, and therefore cannot be considered unfair.

Furthermore, despite the panel's assertion that its finding of legality under the Sherman Act did not mean that Apple's conduct was "categorically" permitted under *Cel-Tech*, *Epic Games*, 2023 U.S. App. LEXIS 9775, at \*96-97, it is settled case-law that, in the absence of any purpose to create or maintain a monopoly, Apple has a "categorical" right to choose with whom it does business. *See, e.g.*, *Trinko*, 540 U.S. at 408; *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009); *Chavez*, 113 Cal. Rptr. 2d at 182-83. "The antitrust laws [do] not impose a duty on [firms] . . . to assist [competitors] . . . to 'survive or expand.'" *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983) (citations omitted). Apple is under no obligation to facilitate third-party payment options—much less if this jeopardizes the integrity of its iOS.

## CONCLUSION

For the foregoing reasons, this Court should grant Apple's rehearing request to clarify that Apple's conduct violated neither the antitrust laws nor the UCL.

Dated:  June 20, 2023

Respectfully submitted,

WHITE & CASE LLP

By:  */s/ Michael E. Hamburger*

Michael E. Hamburger
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
mhamburger@whitecase.com

*Counsel for Amicus Curiae International Center for Law & Economics*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Circuit R. 32-1 because this brief contains 4,178 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated:    June 20, 2023               /s/ *Michael E. Hamburger*

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated:      June 20, 2023                    /s/ *Michael E. Hamburger*